J. D. TUGGLE v. STATE.

No. A-9979.   Nov. 26, 1941.

(119 P. 2d 857.)

210

Otis D. James, Charles W. Harrison, and Charles W. Adams, all of Oklahoma City, and George Hill, of McAlester, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for defendant in error.

JONES, J. The defendant, J. D. Tuggle, was charged in the district court of Garvin county in case No. 2265 with the crime of murder of one Sadie Jones, and was charged by information in the same court in case No.

2268 with the crime of murder of D. Wilburn Jones. The defendant entered a plea of guilty in each of said cases and was sentenced to death in the electric chair at the State Penitentiary for said crimes by him so committed, from which judgment and sentence an appeal was taken to this court.

By agreement, the two cases were consolidated and appealed to this court as one case. The killings occurred at the same time, and the pleas of guilty to the two charges were entered at the same time; and this procedure was followed for the reason that, unless the defendant received relief from the sentences imposed in both cases, it would not avail him anything to secure relief in only one case.

It has been held that an accused has a constitutional right to appeal to the Criminal Court of Appeals from any judgment rendered against him in a court of record, including a judgment rendered on a plea of guilty. Hardy v. State, 35 Okla. Cr. 75, 248 P. 846; Spelling v. State, 55 Okla. Cr. 195, 28 P. 2d 584; Hancock v. State, 57 Okla. Cr. 329, 48 P. 2d 348; McDessey v. State, 61 Okla. Cr. 345, 68 P. 2d 113; Prothero v. City of Tulsa, 67 Okla. Cr. 214, 93 P. 2d 548.

This is an appeal from a conviction, based upon a plea of guilty; and no objections or exceptions were raised in the hearing before the trial court. In an ordinary case, we would not consider any assignments of error presented by the appellant, unless the same had been properly preserved before the trial court, except those questions which are so fundamental in their nature as to deprive the court of jurisdiction to try the accused and sentence him. However, this is a capital case where the accused has been sentenced to death in the electric chair; and, in a case of this sort, it is the practice of

this court to thoroughly examine the record, and consider any errors that may be presented, which are fatal to the accused's rights, even though such errors were not challenged and preserved by objections, exceptions or assignments of error.

The attorneys who have briefed and argued the case in this court on behalf of the defendant did not appear before the trial court, but volunteered their services shortly before the time expired for completing an appeal to this court. Their services have been commendable. It is a sacrifice on their part; and, wholly without compensation, they have written an able brief on behalf of the defendant, and have argued the matter before this court.

The following assignments of error have been presented:

(1) The punishment imposed was cruel and excessive.

(2) The court erred in not furnishing the defendant with an attorney of his choice at all stages of the proceedings.

(3) The court erred in that it appears from the record that the trial court entertained a reasonable doubt as to the sanity of the defendant at the time of the sentence; and, notwithstanding said doubt, he failed and refused to order a hearing to determine the sanity of the defendant as provided by law.

(4) The defendant was not fully advised as to his constitutional and statutory rights, and the consequences of his plea before his plea was made.

(5) The defendant was not of such education and intelligence to understand what his statutory and constitutional rights were, and the consequences of his plea.

After the defendant was sentenced, a transcript of the proceedings before the trial court was prepared and furnished to the Governor as required by law. The Governor of this state, pursuant to section 3172, O. S. 1931, 22 Okla. St. Ann. § 1003, requested an opinion of this court concerning the legality of the proceedings against the defendant, and to ascertain whether according to the record there had been an observance of all of the formalities of law essential to the taking of human life, and whether the trial, conviction, and sentence of death was in accordance with the law of the land.

Pursuant to this request, this court, in an opinion by Judge Doyle, reviewed the record and thoroughly considered the propositions of law raised by the defendant in assignments Nos. 2, 4, and 5, above. In re Opinion of the Judges (In re J. D. Tuggle), 70 Okla. Cr. 83, 104 P. 2d 726, 732.

In that case, Judge Doyle, speaking for the court, after reviewing the record and the various authorities upon the questions involved, concluded:

"Where it appears from the record, as in this case, that a defendant has been fully advised as to his constitutional and statutory rights, and as to the consequences of his plea, and that with such knowledge he deliberately enters a plea of guilty, the trial court is justified in accepting it, even in a capital case.

"From that careful examination and consideration of the record transmitted by you our advisory opinion is that the necessary legal steps and proceedings were taken in this case essential to the taking of human life under a charge of murder; that the defendant was accorded the benefit of all constitutional and statutory rights not specifically waived by him; and that his conviction and sentence of death has been in accordance with the law of the land."

While such an opinion of this court in response to a request of the Governor is merely advisory and not an adjudication, we find that said opinion fully covers the three assignments above named; and we adopt, and reference is made to, said opinion for a full discussion as to those propositions.

It is further contended that the statements made by the trial court in the proceedings indicate that the court had a doubt as to the sanity of the defendant; and that having such doubt, the court erred in not impaneling a jury to inquire into the proposition of the defendant's sanity.

The record discloses that at the time of the arraignment of the defendant before the district court, he entered his plea of guilty after the court had fully advised him as to each and every right which he had under the statutes and Constitution of this state. That after the plea of guilty was made by the defendant, he asked permission of the court to make a statement as to a possible reason for the act which he had committed.

Permission was granted; and the defendant gave a lengthy statement of his life history, including a statement as to what happened at the time he killed Mr. and Mrs. Jones. The defendant, in his statement, relates that he is a sexual pervert, and recites a series of sexual acts committed by him. He also told of committing a burglary on a drugstore and receiving a suspended sentence.

This story related by defendant is a revelation of the depth of degradation to which a human may sink. The atrocious sexual crimes committed by the defendant, according to his story, are enough to make the average citizen shudder and blush with embarrassment to see in print or hear repeated; and they will not be detailed in this opinion.

Insofar as the particular crimes with which the defendant stood charged were concerned, he related that he had gone over to spend the night with his uncle and aunt; that he was sleeping on a pallet in the adjoining bedroom to where Mr. and Mrs. Jones and defendant's half sister were sleeping. That after he had lain on his pallet a while, he got the desire to go into the other room where his half sister was lying, and play with her private organs, and satisfy his sexual appetite. That he went to the bed of his half sister, placed his hands under the cover, and was feeling and fumbling with her when he heard Mr. Jones smack his lips as if he were waking up. That he saw an axe handle laying close to the bed, which he grabbed and used to strike the deceased, Mr. Jones, over the head. The defendant further stated:

"When I hit him the sound of the blow woke the old woman up and when she woke up she screamed and said, 'My God, J. D., don't do that.' I was crazy then, I guess. I knew what I was doing but I couldn't keep myself from doing it, so then I hit her. She fell back on her pillow, and then the kid raised up and I don't know whether the kid caught on to my belt buckle or where and pulled and screamed at me and I hit her, and I knew that I didn't hit either one of them more than twice, and they were alive when I left the house. The first thing I thought of was to get as far away as I could. I wanted to take that kid with me, but I was thinking of getting away. But I knew the kid was bloody and I knew that would cause me to get caught quicker. The old man's pants was under his pillow so I got his pocket book out, and I got his car key. His pocket book had five one dollar bills and one five dollar bill in it and some change, and the pocket knife was in his pockets and I took that, why, I don't know. There was a 16-gauge shotgun sitting against the door facing and I grabbed it then and I drove anywhere from 70 to 90 miles an hour when I left. I drove to Pine Valley, then across the mountains

to Broken Bow. I bought a shirt, cap and necktie and drove to the state line, but not across it, because I was afraid of the Federal Bureau of Investigation, or, in other words, the G-Men. I was nearly out of money and then I started thinking of coming back and giving myself up. I was crazy to find out what had happened, whether they had died, or what had happened, so I came back to Heavener, Okla. I have always made it a habit to go in picture shows. You fellows probably go there for entertainment. I go there merely for the purpose of masturbating, with the help of some small child. I have done it here in Pauls Valley, and there are very few towns in Oklahoma that I haven't been in and done this. I am not saying this for sympathy, no, I am not expecting sympathy. I am just trying to paint a picture of what can happen and what is happening every day. I am trying to give you fellows a reason why I did that. After I got back in Heavener I hocked the man's gun and wrenches to get some gas and I stayed there two nights. Then I came back to Daisy Valley and run the car in a ditch when I run out of gas. When the police and two patrolmen officers picked me up I was pulling a car of my cousin's, John Burleson. I was pulling the car in to get some gas and then come back and give myself up."

After the defendant had completed his statement, considerable conversation occurred between the accused and the trial judge, during which the court made the following statement:

"As to the matter of passing sentence, under the law, if a jury had found you guilty and it were in term time, as we lawyers express it, I couldn't pass sentence upon you for 48 hours, and under the circumstances of this case, I refuse to pass sentence on you under 48 hours. It may be a matter of serious mental disturbance for you, not knowing what to presume will be the sentence. By the Defendant: None, whatever. By the Court: I am glad for that because I would not inflict additional mental worry upon you at all, but mine is a responsi-

bility which I prefer to take seriously and deliberate upon profoundly and discharge conscientiously. By the Defendant: I appreciate that, sir. By the Court: If it is agreeable with you, I am going to set your sentence date for high noon, Thursday, May 23. By the Defendant: That is Thursday of this week, is it not? By the Court: Yes. By the Defendant: The only thing that would make it any more agreeable would be sooner than that. Of course, that matter is entirely up to you, it doesn't particularly matter to me. By the Court: Frankly, one reason I want to set the date for then is that I want to talk to an old friend of mine, Dr. Griffin, the head of the mental institution at Norman, who is an international authority on the conditions of abnormality."

On May 23, 1940, the court appointed J. T. Blanton to confer further with the defendant concerning the crimes with which he stood charged, and continued further proceedings to June 3, 1940. Considerable colloquy occurred on May 23rd between the court and the defendant, in the course of which the court made this statement:

"I am going to take a copy of the record, as I told you I haven't had an opportunity to do it, and talk to Dr. Griffin who is the head of the State Hospital at Norman and frankly, I am going to inquire into the proposition of your sanity."

On June 3, 1940, the defendant again appeared in person and with his attorney, J. T. Blanton, at which time he personally stated to the court that he wished to stand on his former plea of guilty to each of the charges of murder.

The court stated:

"I have made, I believe, more than a reasonable effort to determine the true status of your mind at the present time and at the time of the commission of this crime. The person to whom I alluded by making a statement that I was going to interview him with reference to the matter of your mentality, to wit, Dr. Griffin, head

of the State Hospital at Norman, was out of Norman for an indefinite stay; however, I got to talk to Dr. Rayburn, his assistant, who has been a doctor in that institution and an authority on abnormalities of the mind for 15 years or longer. The Doctor tells me that your mind is such that it might become unstable but, however, on the occasion of this crime that you were in possession of your mental faculties. I have written Mr. J. F. Dunn, Warden of the State Penitentiary, at the suggestion of Dr. Rayburn, who stated that Mr. Dunn is as much an authority on such conditions as the average doctor, or even more so, because he has dealt with persons convicted of crime for a number of years. This morning, in the U. S. mail I received under date of June 1, 1940, this letter of Mr. Dunn which reads, omitting the address: 'In re: J. D. Tuggle, No. 41269. Dear Judge: This is to acknowledge receipt of your letter of recent date, relative to the mental condition of the above named and numbered subject. I am no authority whatsoever in judging the mentality of criminals, but after talking with this subject on two different occasions, I have come to the conclusion that he is perfectly sane and in all respects seems to be a rather intelligent boy. Yours very truly,' Signed, 'J. F. Dunn, Warden.' "

The remarks of the court hereinabove quoted constitute only a small part of the conversation had with the defendant in the proceeding before the court. But the statements of the court above quoted concerning his intention to talk with Dr. Griffin and others concerning the mental condition of the defendant constitute the basis for the contention of defendant's counsel that the court had a doubt as to the sanity of the defendant and should have impaneled a jury to determine the question of the defendant's sanity.

It is provided by sections 3211 (as amended, Laws 1935, p. 19, § 1), 3212, and 3213, O. S. 1931, 22 Okla. St. Ann. §§ 1161, 1162, and 1163, as follows:

"An act done by a person in a state of insanity cannot be punished as a public offense, nor can a person be tried, adjudged to punishment, or punished for a public offense, while he or she, as the case may be, is insane * * * *."

"When an indictment or information is called for trial, or upon conviction the defendant is brought up for judgment, if a doubt arise as to the sanity of the defendant, the court must order a jury to be impaneled from the jurors summoned and returned for the term, or who may be summoned by direction of the court, to inquire into the fact."

"The trial of the cause or the pronouncing the judgment, as the case may be, must be suspended until the question of insanity is determined by the verdict of the jury."

In the case of Maass v. Phillips, 10 Okla. 302, 61 P. 1057, 1058, it is stated:

"But who is to determine as to whether such doubt exists in the mind of the court? In reason only one answer can be given. The court alone must say if such doubt exists. The trial judge sees the defendant, and is necessarily more or less familiar with the circumstances surrounding him and his case; and the fact that the county board of insanity may have adjudged him insane prior to the time fixed for his sentence, even if the order of such adjudication was admitted in evidence or considered by the trial court, would not necessarily control its action, because such order is not an adjudication of finding of any court, and is not admissible upon a trial to prove the insanity of such person."

In the recent case of Ex parte Gilbert, 71 Okla. Cr. 268, 111 P. 2d 205, 206, Judge Barefoot, in an opinion of the court, discussed the statutes concerning the question involved herein, and cited the various authorities of this state and other jurisdictions bearing upon this point. In that case it is stated:

"If a doubt arises in the mind of the court, he must order a jury to be impaneled from the jurors summoned and returned for the term, or who may be summoned by direction of the court, to inquire into the sanity of the defendant, either before the trial or before judgment and sentence is pronounced. * * *

"This doubt may arise in the mind of the court upon application for a continuance, motion for a new trial, motion in arrest of judgment, by ex parte affidavit or declaration of a bystander, or the court of its own motion; and while the court cannot act arbitrarily in the matter, it has the right to look to the source of the information, and come to a proper conclusion, from all the facts and circumstances, whether there is a doubt in his mind as to the sanity of the defendant. He may also consider the fact that the question of insanity was never raised."

The defendant remembered with clarity, the minutest details of the killings, as shown by his statement. He knew he was doing wrong all of the time he was committing the crimes. We cannot assent to the proposition that a morbid state of affections or passions, or an unsettling of the moral system, where the mental faculties remain in a normal, sound condition excuses actions, otherwise criminal.

We have given this contention of the defendant the close study and attention which such a question merits. The acts of sodomy, masturbation, fornication, and other sexual offenses related by the defendant do not, in themselves, show insanity. They are just evidence of a looseness of morals that has been encouraged and cultivated by living with prostitutes, whoremongers, and pimps in houses of ill-fame. The details of wickedness related by the defendant were so debased as to startle any rational, moral citizen; and it is no discredit to the trial judge that he concluded, after hearing the defendant's story,

to converse with Dr. Griffin and others concerning the mental and physical condition of the defendant.

The record indicates that such action of the court was not taken because there was a doubt as to the defendant's sanity; but it merely indicates that the judge was being cautious and doing his best to proceed in an orderly, legal manner to learn all that he could about the defendant before pronouncing judgment upon him. The court only accepted the plea of guilty entered by the defendant after continuing the case on two occasions, and finally accepted it only at the insistence of defendant, after he had concluded that the defendant fully comprehended the seriousness of the charges which confronted him, and understood all of his legal and constitutional rights.

The fact that there was no evidence of insanity presented to the trial judge and nothing in the record to indicate that the defendant was insane at the time of the commission of the crimes, or insane at the time judgment and sentence was pronounced against him, does not preclude a further investigation into the sanity of the defendant since his incarceration in the State Penitentiary. See section 3174, O. S. 1931, 22 Okla. St. Ann. § 1005.

The Governor, if a question of the sanity of the defendant is presented to him, will have proper inquisitions by alienists appointed by him made for his guidance.

Lastly, it is contended that the sentences pronounced against the defendant are cruel and excessive. It is probable that if the defendant had never made his statement, the prosecution would have ascribed robbery as the motive for the killings, because the watch, money, knife, shotgun, and automobile of the deceased were taken after the killings. The defendant, in relating how the

crimes were committed, details very minutely the things that occurred. He killed his uncle because he thought that he was about to awaken and catch him perpetrating a sexual crime against his half sister. He cruelly struck his aunt over the head several times with the axe handle, after she had awakened and pleaded with him to stop. He then struck his own half sister, seriously injuring her. With his three victims lying unconscious, and two of them never to recover, he coolly searched under deceased's pillow for money, and rifled the pockets of the deceased's pants for the car keys and other personal property of the deceased, which the defendant stole at that time.

The infliction of the death penalty should not be imposed except in the most exceptional cases. We have concluded that this case is one of those cases, where the defendant, by his own action, has forfeited his right to live. If this is not a case where capital punishment should be imposed, then such punishment might well be eliminated from our statute books.

After a careful consideration of the whole record, we find no errors in the proceedings had before the trial court, and feel that the judgment and sentence pronounced against the defendant was fully justified under the facts, and that the judgment of the district court of Garvin county in each of said cases should be affirmed.

The original time for execution having passed, owing to the pendency of this appeal, it is considered, ordered, and adjudged by this court that the judgment and sentence of the district court of Garvin county be carried out by the electrocution of the defendant on the 9th day of February, 1942, in the State Penitentiary at McAlester, Okla.

BAREFOOT, P. J., and DOYLE, J., concur.