CLIFF THOMAS NORMAN v. STATE.

No. A-10547.   July 11, 1945.

(160 P. 2d 739.)

80

George B. Forrester, of McAlester, and R. B. Drake, of Sulphur, for plaintiff in error.

Randell S. Cobb, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and H. W. Broadbent, Co. Atty., and Holmes H. Colbert, both of Sulphur, for defendant in error.

BAREFOOT, P. J.   Defendant, Cliff Thomas Norman, was charged in the district court of Murray county with the crime of rape in the first degree, and on his plea of guilty and testimony taken was sentenced to die by electrocution, in the manner prescribed by law. From this judgment and sentence he has appealed.

The information charging defendant with rape in the first degree was filed by the county attorney of Murray county on April 11, 1944, and the charging part was as follows:

"That Cliff Thomas Norman in said County and State aforesaid, on the day and year aforesaid, did, unlawfully, wilfully, wrongfully, forcibly, violently and feloniously make an assault in and upon one Kathleen Bowser, a female not the wife of him, the said Cliff Thomas Norman, and did then and there unlawfully,

wrongfully, without her consent and against her will, by means of force and violence, overcoming her resistance rape, ravish and carnally know her, the said Kathleen Bowser, contrary to the form of the statutes in such case made and provided, and against the peace and dignity of the State."

The crime of which defendant was charged was committed in the early morning of April 7, 1944. A preliminary complaint before a justice of the peace of Murray county was filed on the same day, and on the 10th day of April, 1944, a hearing was had on the preliminary complaint. Defendant entered a plea of guilty, and was held without bond to the district court of Murray county. An information, as above stated, was filed on April 11, 1944. Defendant was arraigned in the district court on April 12, 1944, and on this day two attorneys of the Murray county bar, George B. Forrester and R. B. Drake, were appointed by the court to represent the defendant.

The record reveals the following proceedings:

"Now on this the 12th day of April, 1944, the Court regularly opened pursuant to law, the Honorable J. I. Goins, District Judge, presiding, Marvin Stephens, Sheriff, and J. H. Samples, Court Clerk, and after court was regularly opened, the following proceedings were had herein: (Among other things) By the Court: What have we this morning? By Mr. Colbert, County Attorney: If the court please, we have a defendant present at this time charged with rape in the first degree. By the Court: What is your name? By the Defendant: Cliff Thomas Norman. By the Court: Are you represented by counsel, do you have an attorney? By Defendant: No, I do not. By the Court: Very well, I am going to appoint Mr. George B. Forrester and Mr. R. B. Drake to represent you. By Mr. Forrester: If the court please, I will accept the responsibility, so far as I am concerned, and will ask permission at this time to confer with the defendant, and if you have no objection we will go to

your private office. By the Court: Very well. (Whereupon Mr. George B. Forrester and Mr. R. B. Drake, together with the defendant, Cliff Thomas Norman and the sheriff retired to the chambers of the district judge and conferred with the defendant for some 20 or more minutes, after which they all returned to the court room.) By Mr. Forrester: If the court please, we have conferred with the defendant at some length and explained to him what the consequences would probably be if he should enter a plea of guilty in this case, and we have also investigated his background and history and I will inform the Court that we find no evidence of any mental trouble heretofore and none now, and as I said we have advised him of the consequences of his act and he informs us that he is guilty of this crime and desires to enter a plea of guilty in this case. By the Court: Mr. County Attorney, will you please read the information to the defendant in open court. (Whereupon the county attorney, Mr. Holmes H. Colbert, read in open court the information filed herein on the 11th day of April, 1944, and as shown on page 10 of this transcript, together with a list of the witnesses endorsed on said information.) By the Court: Now your name, you say, is Cliff Thomas Norman? By the Defendant: Yes, sir. By the Court: You have a right, as do all defendants in a criminal case, to be represented by counsel, and I have appointed you counsel here this morning to represent you and they have advised with you at some length, you also have a right to withhold your plea for 24 hours if you desire. By Mr. Forrester: If the court please, we have advised the defendant, our client, as to all of those matters and he desires to enter his plea at this time. By the Court: Is that your desire? By the Defendant: Yes, sir. By the Court: You mean by that you are waiving the 24 hours you have to enter your plea of guilty and desire to enter it at this time? By the Defendant: Yes, sir. By the Court: You know what you are doing, and you are fully satisfied as to what you are doing, is that right? By the Defendant: Yes, sir. By the Court: No one has made any promises to you to get you to plead guilty to this

case? By the Defendant: No, they have not. By the Court: Now that is right, is it? By the Defendant: Yes, sir, that is right. By the Court: And what is your plea at this time? By the Defendant: I enter a plea of guilty. By the Court: You enter a plea of guilty to the charge against you in this case, which is rape in the first degree, because you are guilty of that crime, is that it? By the Defendant: Yes, sir. By the Court: You are guilty? By the Defendant: Yes, sir. By the Court: Mr. County Attorney, what do you have to say? By Mr. Holmes Colbert, County Attorney: If the court please, this is a very aggravated case and we would like to offer some proof as to the crime that was committed. By the Court: Very well. The defendant may be seated."

Evidence was then offered by the state, which developed the following:

Kathleen Bowser, whose husband was overseas in the Army, was working at the 77 Cafe, in the city of Davis, Murray county, on April 7, 1944. Some time after midnight, the cafe was closed, and Mrs. Bowser started walking to her home. She was attacked, assaulted, raped, cut with a knife, robbed of $46, and finally shot in the mouth.

The evidence revealed that King Crippen, the city marshal of Davis, was called from his home about 3:30 on the morning of April 7, 1944. He immediately went to the home of Luther Greer, who had called him, and "went in the house and saw Mrs. Kathleen Bowser in the bathroom sitting on the stool leaning over the sink, her head over, and trying to spit blood. She was bloody all over and blood running from her mouth, and she could not talk."

A doctor was called, and she was taken to the hospital, and there wrote down on paper what had happened to her, and gave the officers a description of the party who had assaulted, raped, robbed, cut and shot her.

Marvin Stephens, sheriff of Murray county, who lived at Sulphur, the county seat, was notified and immediately went to Davis. As soon as he arrived and contacted the city marshal, the officers went to the hospital to talk with Mrs. Bowser, but she was unable to talk. She answered their questions and gave them information by writing. She wrote: "at a culvert south of town, he raped, stabbed and shot me and robbed me." She also described the man, and the way he was dressed, saying that he was dark, and wearing "army flyers' coveralls."

The officers went immediately to the scene, where they found "three big puddles of blood there on the ground under the culvert," and also found a ladies' purse, and a .380 automatic shell. They decided to leave the scene and return after daylight. They went to Davis, and to a cafe for coffee. A girl who worked in the cafe told them about a negro man being in the cafe late that night dressed as Mrs. Bowser had described her assailant. They learned that this man was working with an "extra gang" for the Santa Fe railroad, and that he was called "Red." They immediately went to the railroad yards and aroused the foreman, who took them to a car and called the defendant and told him to open the door. The defendant was sitting on the side of his bed, but had not dressed. Sheriff Stephens testified that he picked up a suitcase and asked to whom it belonged, and the defendant answered, "Mine." He opened it and pulled out a pair of coveralls and pair of gloves, and the defendant admitted that they were his. Both the coveralls and the gloves were covered with fresh blood. A brown hat was hanging near defendant's bed.

The defendant was taken to the city jail, and the officers returned to the scene of the crime. They found

a blood-soaked scarf, some ladies panties that had been cut from the top to the end of the leg; and raked a knife from a pool of water. They returned to the city jail, dressed the defendant in the clothing found in the suit case, and took him before Mrs. Bowser, who positively identified him.

After returning defendant to the jail, the officers found a ripped place in his cap, and hidden therein the $46 Mrs. Bowser had told them had been taken from her purse. She had told them of two $2 bills, and these bills were among those found in the cap. Defendant then told the sheriff where he had hidden the gun, in the roofing of the bunk car, and the officers returned to the car and found a .380 Remington automatic pistol. They also found a pair of shoes concealed in the bunkhouse, which defendant admitted were his, and which matched perfectly the tracks found at the scene of the crime. Defendant told the officers that he had dropped Mrs. Bowser's wrist watch in the toilet stool in the jail, and it was found there. Defendant was the only person confined in the jail at the time.

After defendant's arrest on the morning of April 7, 1944, he was taken by the sheriff of Murray county to the county jail at Sulphur, and on the same afternoon to the penitentiary at McAlester, for safekeeping. This was done after the sheriff had conversed with the district judge over the telephone and received his permission to take defendant to McAlester. The defendant remained there until April 10th, the day of the preliminary hearing, when he was returned to the county jail at Sulphur.

At the preliminary hearing, Dr. Connell testified as to the wounds found upon the body of Mrs. Bowser:

"Q. Did you examine Mrs. Bowser on April 11, 1944 —first on April 7, 1944, who was a victim of an assault at the time? A. Yes, sir, on April 7th I did. Q. What did you find? A. I found a severe stab wound on the right side about there (indicating) and up under her left eye and under the chin and a small wound about here (indicating) and she had been shot through the mouth about there (indicating), and two or three teeth above and below had been knocked out by the bullet and the tongue lacerated, and a head wound on top of the head. . . . She could not talk, her throat was swollen and there was a bullet lodged in her neck and she was very weak and suffering from severe shock; she could write on paper with a pencil and wrote some things down and she said she knew she was just about dead and could not last very much longer."

A written statement was made by defendant in the office of the county attorney when he entered a plea of guilty in the justice court; and this statement was offered in evidence before the court prior to sentencing. The statement was made in the presence of M. W. Holland, deputy sheriff of Murray county, and his testimony with reference to the taking of the statement was as follows:

"Q. And you were in the county attorney's office on the 10th day of April, 1944, when defendant, Cliff Thomas Norman, made a statement and it was taken down and written on a typewriter and after it was written up it was read over to him, as he had told it and re-read to him, and he signed it in your presence, and in the presence of others, is that right? A. Yes, sir. Q. I hand you a statement and I will ask you if that is the statement he made in the county attorney's office at that time? A. Yes sir, and that is his signature. By the Court: Was it read to him before he signed it? A. Yes, sir. By Mr. Colbert, County Attorney: Q. And it was written out as he told it to the county attorney? A. Yes, sir."

(The statement is admitted in evidence.)

"By Mr. Forrester, of Counsel for Defendant: Q. Mr. Holland, at the time this statement was made or immediately after the time it was made, or immediately before it was made or written down, did you or anyone in your presence make any offer to the defendant here of getting him off with a lighter sentence if he would make the statement or that it would be best for him to make a statement and tell the whole truth? A. No, sir, there was not any such statement made to him directly or indirectly. Q. He made the statement upon his own free will and accord, voluntarily then? A. Yes, sir. Q. Were any threats made against him if he did not tell the truth about it? A. No, sir. Q. Or was any statement made to him that if he did not tell the truth about it they would take him out and turn him over to the mob? A. No, sir. By Mr. Colbert, County Attorney: Q. This statement was made after he had been in the penitentiary for safekeeping at McAlester for two or three days? A. Yes, sir. Q. And at the time there was no one around the courthouse or anyone to scare him or anything and it was quiet and peaceable there in the office and around the courthouse? A. Yes, sir, that is true. Q. In other words, there was no one around at all, either outside or inside except the officers? A. That is all. Q. And there was no promises made to him whatsoever? A. No, sir."

The statement is as follows:

"State of Oklahoma, Murray County, ss.

"I, Cliff Thomas Norman, of lawful age after being duly sworn deposes and says, that I make the following statement of my own free will and without fear or of any promise made to me that I will receive any leniency or consideration whatsoever; I am 29 years old and formerly lived in Calvin, Texas; I have worked in Oklahoma for about 1 year and was working for the Santa Fe Railroad on the 7th day of April, 1944, at Davis, Oklahoma; about 12:30 a.m. on April 7th, 1944, I saw a white girl walking down the street of Davis, Oklahoma, and I decided to follow her, I had a pistol (.380 automatic) in my possession, after the white girl turned south from Main

street I overtook her about I block away and pointed my pistol to her back and made her go with me about two blocks west and three blocks south on the railroad track when I stopped her and asked her to let me have sex intercourse with her, she refused and I struck her with my pistol on her head; I then took her to the ball park intending to rape her and I saw some houses close by and she was trying to scream and get away and I then took her out of the ball park and as I was taking her through the fence she tried to get away from me and I hit her with my fist and knocked her down and drug her out in the road and took her down the road about one-fourth mile to a bridge or culvert and I took her under the bridge and struck her and choked her down with a rag tied around her neck and when she was too weak to resist me I raped her. I had already told her I would kill her if she screamed after she screamed once. After I raped her I searched her purse and found some money in bills and a pocketknife. I was holding my gun on her and searching her pocketbook and she would not let me get her money and I had taken a knife from her as we reached the culvert and I stuck this knife in her throat to kill her and then I took her money and watch and left the knife sticking in her throat. I was afraid that I had not killed her so I shot her one time in the mouth and left her for dead. I covered her up with a coat and left. I afterwards learned that the girl's name was Kathleen Bowser and that she did not die.

"I swear that the above statement is correct.

"(Signed) Cliff T. Norman.

"Witnessed by
"M. W. Holland
"Jim H. Elliott

"Subscribed and sworn to before me this 10th day of April, 1944.

"O. C. Shaffer, Justice of the Peace."

After the above, the following proceedings were had:

"By Mr. Colbert, County Attorney: That is all, if the court please. We do not desire to offer anything

further as it seems to be clear enough and any other testimony that we have would be cumulative and corroborative of the witnesses we have heretofore offered. By Mr. Forrester of counsel for Defendant: We have nothing, if the court please. By the Court: Very well. The defendant will please stand up. (Defendant standing) Do you know of any reason why I should not pass sentence upon you at this time, or do you have any thing to say at this time before I do pass sentence upon you, or as to why I should not pass sentence upon you? By the Defendant: No. By the Court: After hearing this testimony that has been offered and the reading of your signed statement do you still want to enter your plea of guilty to the crime of rape in the first degree? By the Defendant: Yes. By the Court: It will be the judgment and sentence of this court based upon your plea of guilty that you be by the sheriff of Murray County conducted to the State Penitentiary at McAlester, Oklahoma, and there delivered to the warden of the State Penitentiary where you will suffer death by electrocution on the 22nd day of June, 1944, for the crime of rape in the first degree.

"It will be the further judgment and sentence of this court that the sheriff of this county deliver you to the warden within the next ten days for the purpose of executing this judgment and sentence. It is the further order of the court that in compliance with the laws of the State of Oklahoma, that a complete transcript of the testimony in this case and all proceedings had herein be prepared and the same forwarded to the Governor of this state for review.

"The prisoner will now be in the custody of the sheriff."

Counsel for defendant filed an appeal in this court on July 13, 1944, and attached to his petition in error a copy of a newspaper published at Sulphur, in Murray county, dated April 13, 1944, which made reference to a mob having gathered at the jail in Sulphur prior to

the arraignment of defendant in the district court. The case was assigned for oral argument in this court on December 13, 1944, and at that time representations were made to this court that certain demonstrations had been made in the courtroom at Sulphur at the time defendant was sentenced.

An order was entered directing that a hearing be had before the trial court, and that testimony be taken with reference to this matter, and the evidence transcribed and filed in this court as a part of the record in this case. It was ordered that the Attorney General have a representative at this hearing.

Defendant filed what he denominated a "supplemental motion for new trial." No motion for new trial had been previously filed, but the trial court permitted the supplemental motion to be filed, and was very liberal in allowing the defendant to offer evidence in support thereof. A hearing was held in the district court room in Sulphur before trial Judge J. I. Goins, on December 19, 1944, and a transcript of the proceedings filed in this court on January 9, 1945. The defendant was represented at this hearing by his counsel, George B. Forrester and R. B. Drake.

The defendant placed upon the witness stand Paul John, the editor of the Sulphur Times-Democrat, the paper that published the story with reference to a mob having been formed prior to the arraignment of the defendant, and a copy of which was attached to the petition in error. The court permitted the introduction of the paper. It was dated April 13, 1944, one day after the defendant was sentenced by the district court. Mr. John testified to writing the article. He testified that he attended the hearing on April 12, 1944, in the district

court when the defendant was sentenced. He saw no demonstration of any kind at that time, or at any other time. The courtroom was quiet and orderly. He saw nothing that would cause anyone to think the defendant or his attorney were in fear, at the time of entering defendant's plea. That there was a large crowd in the courtroom at the time defendant was sentenced, but witness had seen larger crowds there at other times, and he saw nothing unusual or disorderly at any time.

There was also introduced in evidence a letter written by a minister of Sulphur to the sheriff of Murray county, congratulating him upon upholding the law when the mob appeared at the jail. This letter was printed in the paper on April 20, 1944.

Marvin Stephens, the sheriff of Murray county, was called by the defendant. He testified as to his investigation at Davis on the morning and day of April 7, 1944, as heretofore set out. With reference to the forming of a mob, he testified that the defendant was in jail in Davis following his arrest. He saw a number of old men such as generally hang around the jail. No one made any demonstration of any kind. He took the defendant to Sulphur about 11 o'clock in the morning of April 7th, and in the afternoon of the same day took him to the State Penitentiary at McAlester for safekeeping, after calling the district judge over the telephone and getting his permission. This was in keeping with his practice where men were charged with serious crimes. He returned the defendant from McAlester to Sulphur about 4 or 4:30 in the afternoon of April 10, 1944, for the purpose of having his preliminary examination. The defendant was kept in the Murray county jail from the time of his preliminary hearing on April 10th, until his arraignment and plea of guilty in the district court on the morn-

ing of April 12th. Sheriff Stephens testified that in the early part of the night of April 11th, and while the defendant was in the Murray county jail, a crowd of men came to the front of the jail. Only about seven or eight of them came to the door where he could see them, and some of them had handkerchiefs over their faces. That "they stated they wanted the negro." The sheriff did not see any weapons of any kind on any of the men. He assured the parties that justice would be dealt the defendant. He told them defendant had entered a plea of guilty, and it was best for the law to take its course. That he did not know just what punishment the court would give defendant, but he would get his just punishment. That after he talked to them, they went away, and did not return. Defendant at the time was in a cell and two doors leading to the jail cells were closed, and the defendant could not have heard the talk between him and the crowd, and they did not talk loud or make any threats or demonstration. He at no time told the defendant of the presence of anyone, and did not know of anyone else doing so. He also testified that he took the defendant to the district court room on the morning of April 12th, when he entered his plea of guilty. He did not have him handcuffed. He stood in the door while the attorneys appointed for defendant talked with him, but could not hear what they said. There was no demonstration of any kind in the courtroom. There was some tension, as there always is when a man is being sentenced, but nothing out of the ordinary. He had seen larger crowds in the courtroom. On the afternoon of April 12th, he took defendant back to the State Penitentiary at McAlester, in compliance with the judgment and sentence of the court.

The state placed M. W. Holland, deputy sheriff,

upon the witness stand. He testified on cross-examination that he was present when the defendant made his statement and confession of guilt. He was also present at the office of the justice of the peace when he entered his plea of guilty. That no threats were made, and no force of any kind was used against the defendant, nor were any promises made him. He stated that he was guilty and wanted to plead guilty. He also testified, as heretofore related, as to the conditions in the district courtroom at the time defendant entered his plea of guilty.

King Crippen, city marshal of the city of Davis, was called as a witness by the defendant, and testified with reference to his investigation and the arrest of the defendant on the morning of April 7, 1944. Also, as to the conditions existing in the courtroom at the time defendant entered his plea of guilty. His testimony was in accord with others who testified in that connection.

The state offered 17 witnesses, each of whom testified that they were present in the courtroom at the time defendant entered his plea of guilty and was sentenced. Among those witnesses were H. H. Colbert, attorney of Sulphur; J. H. Samples, court clerk of Murray county; S. J. Henderson, cattleman; Gene Wiggins, county treasurer; Bill Meyers, father of the young woman; O. C. Shaffer, justice of the peace before whom the complaint was filed; Price Burch, chairman of the board of county commissioners of Murray county; Oscar Huffine, county superintendent of Murray county; Buck Learey, hardware merchant; and Doctor Connell.

It is unnecessary to unduly lengthen this opinion by reviewing their testimony. Each testified that he was in the courtroom at the time defendant was ar-

raigned, and that there was no demonstration of any kind, and that the crowd was quiet and orderly. That when the sentence was pronounced the crowd dispersed in an orderly manner.

Some of the witnesses testified concerning remarks made by Mr. Forrester, attorney for defendant, after defendant had been sentenced by the court. Marvin Stephens, sheriff of Murray county, testified on this point:

"Q. State whether or not following the passing of judgment and sentence on Cliff Thomas Norman, if you heard counsel, to wit, Mr. Forrester, make any statement with reference to the manner with which this case had been disposed of? A. Yes, sir, I did. Q. I will now ask you to state what that statement was. What was the statement made and where was it made? A. It was made in the county attorney's office. Q. How long after the court passed sentence on Cliff Thomas Norman? A. Just a few minutes, I don't know just how long. Q. What was the statement? A. Well, we were discussing the case and he made the remark it was an orderly courtroom; while it was a regrettable affair it was regularly conducted and there certainly would not be any comeback on any grounds. That may not be exactly the words but almost."

During the first oral argument before this court, someone said that a man by the name of Shorty Henderson was seen in the courtroom with a rope in his possession at the time defendant was sentenced. Shorty Henderson was called as a witness and testified that he at no time had a rope in his possession or in any way made any demonstration against the defendant. He was corroborated by numerous witnesses, including the father of Mrs. Bowser.

At the conclusion of the hearing in Sulphur on December 19, 1944, Judge J. I. Goins made the following statement:

"I do want to summarize this thing from the beginning to the end, not because this court owes an apology or explanation for any judicial act, but for the purpose of clarifying this record and the further purpose of getting to the Criminal Court of Appeals the information they so desire. One morning, I believe, the next morning after the commission of this crime, my telephone rang and the sheriff of this county informed me at the time that a crime had been committed in Murray county. I live at Marietta, in Love county, and he wanted my permission to take the defendant to McAlester, and he told me the defendant had been apprehended and was in jail, and knowing the condition of the jail, he told me of the nature of the crime and he thought best to take the defendant to the State Penitentiary for safekeeping, and wanted my permission to do that, and I gladly gave him my permission and told him to take him to the penitentiary, and if the warden would not accept him without a written order, to get in touch with me. As far as I remember, I heard nothing more about the case until the following Wednesday, which is my regular day to come to Murray county for the purpose of holding my weekly docket, and I came to the usual place and parked my car and noticed quite a few more people around the courthouse than usual, and some men standing at the north door of the courthouse, and I shook hands with those, as I usually do, and came through into the lobby of the courthouse, and there were several in the lobby, and I greeted them, as usual. There was nothing there to put me on notice as to anything out of the ordinary, and I came on into the court clerk's office and was there informed this defendant would probably enter his plea of guilty that day. There was nothing about the crowd any different from any other crowd in the courtroom or about the courthouse, or from this crowd here today, and I would think many of the people who were here on that occasion are here today. They appear to me to be the same type of people, and I was looking at the jury box a while ago, and I saw two men in the jury box under the age of 65, and on that day the jury box was full of that aged men, and I want to say

here they are always welcome to come in and visit this court while the court is in session or to visit the judge at any time, they are always welcome, the doors are open to them and always will be so long as they conduct themselves in a gentlemanly-like manner. The county attorney and the sheriff or the clerk, or some of them anyway stated there was an arraignment to come up and the Sheriff went over to the jail and brought the defendant, Cliff Thomas Norman to the courtroom, and I noticed him coming to the courthouse from the jail. He was not handcuffed and he came in and took a seat at that table within arms length of a group of men on the front seats there. The sheriff was not too close to him and the defendant, in my opinion, was calm and composed and he was not in any fear of his life or bodily harm. The defendant said he did not have counsel representing him, and I appointed counsel for him and Mr. Forrester gladly accepted the appointment and he was given ample time, all the time they needed to consult, and afterwards they came back in the courtroom on their own initiative, they came when they were ready to come, counsel for defendant was not afraid, and I believe his statement today he was not afraid, I think that is correct, and he was certainly in the same jovial spirit as today, and as at all times. If there had been any threats of violence against this defendant, and I had known about it, the defendant would not have been sentenced that day, because that is not orderly procedure, and I certainly had that in mind when I was going through the hearing, taking this testimony, observing this crowd, during the time the defendant and his counsel were conferring, when the defendant came in the courthouse there was no shuffling of feet and no nervousness or movements of any kind among this crowd of people. I would have observed it, if there had been, and I would not have tolerated it one minute.

"After sentence was imposed, and after having asked this defendant many times if he still wanted to plead guilty to this crime, for I wanted to know if he had been threatened, and I wanted to be positive that he knew

what he was doing, and knew the consequence of his acts, and he said he did, and wanted sentence to be imposed upon him then, he said he was guilty, he had made that statement several times to others and I came to the conclusion this defendant should suffer the extreme penalty, which was assessed, and when it was assessed, this crowd made no demonstration of any kind, either of approval or disapproval, and then court recessed and I came back to the clerk's office, and after a few minutes I went back to the courtroom and disposed of other business and then went to lunch and returning to the courthouse and to the clerk's office, and after noon some time I witnessed the defendant being put in the sheriff's car and carried away to the State Penitentiary. There was no one gathered about the jail or about the courthouse grounds at that time, and the few present did not show any signs of vengeance or violence of any nature or character. The crowd was orderly. I might note here a judge who has had long experience on the bench and holding trials will detect order quicker than anyone, and this crowd was not any larger or as large as some crowds in this courtroom since I have been holding court here. In 1935 I tried some murder cases in this courtroom when we had tremendous crowds, but the people here then were very orderly and attentive, and I was glad to have them as I am now, because they had a right to come, these are their officers and they come to see government in operation and see justice meted out, and they had a right to be here and I certainly don't believe any person was here for the purpose of leading a riot or leading a mob in doing bodily harm to this defendant. As to any mob gathered at the jail, or any group of citizens at the jail, I knew nothing about that prior to the time sentence was imposed. I did not see anyone scared or nervous and this court was not scared and I do not think the defendant was scared, and I know his attorney was not scared, and I did not see anyone in the courtroom that was scared or perturbed and I don't think the defendant was scared, he did not show it.

"You have something here in the form of a supplemental motion for new trial. You did not pray for a new trial. It is to take testimony as to whether or not mob action was imminent on the 12th day of April, 1944, and this court finds no mob action was imminent, newspaper story notwithstanding, there is nothing in the record to indicate anything of that kind, and nothing in this record to indicate this defendant is not guilty, and nothing in this record to indicate a new trial should be granted, and for those reasons your motion will be denied."

The only question raised in the supplemental motion for new trial, which we will consider as having been properly filed, is that the defendant was deprived of his constitutional rights at the time he entered his plea of guilty and judgment and sentence was pronounced against him, in the manner heretofore stated.

Counsel for defendant does not set out the section of the Constitution or any section of the statute of this state which he claims was violated, but we presume he had reference to the due process clause of the Constitution of the United States, which is Amend. 14, sec. 1, and reads as follows:

" . . . nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Tit. 22, O. S. 1941 §§ 961 and 962, are as follows:

"961. After a plea or verdict of guilty, or after a verdict against the defendant on a plea of a former conviction or acquittal, if the judgment is not arrested or a new trial granted, the court must appoint a time for pronouncing judgment.

"962. The time appointed must be at least two days after the verdict, if the court intend to remain in ses-

sion so long; or, if not, at as remote a time as can reasonably be allowed."

At the time of the hearing on December 19, 1944, counsel did not make a motion or request that defendant be permitted to withdraw his plea of guilty. His only contention was that he did not have a fair trial. After the hearing, the case was again assigned for oral argument in this court and the defendant was represented by his counsel. The case was finally submitted on February 7, 1945.

The only question before this court is the purely legal one as to the defendant's right to enter a plea of guilty at the time of his arraignment and his right to waive the two days for pronouncement of sentence, as was done in this case.

We unhesitatingly say that undue haste should never be permitted where one is charged with a serious crime. This is governed by the facts and circumstances of each individual case. Ex parte Meadows, 70 Okla. Cr. 304, 106 P. 2d 139.

In the case of Johnson v. Zerbst, 304 U. S. 458, 58 S. Ct. 1019, 1023, 82 L. Ed. 1461, 146 A.L.R. 357, it is said:

"A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of the right of counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."

And in connection with capital cases, see In re Tuggle, 70 Okla. Cr. 83, 104 P. 2d 726; Tuggle v. State, 73 Okla. Cr. 208, 119 P. 2d 857.

The question of one's right to waive constitutional or statutory provisions that were enacted for their benefit has been so fully discussed in late cases by this court, and the early decision cited and upheld, we merely cite them. In re Tuggle, supra; Tuggle v. State, supra; Ex parte Gilbert, 71 Okla. Cr. 268, 111 P. 2d 205; Ex parte Meadows, 70 Okla. Cr. 304, 106 P. 2d 139; Ex parte Wooldridge, 72 Okla. Cr. 292, 115 P. 2d 284; Ex parte Bradley, 72 Okla. Cr. 107, 113 P. 2d 611; Hudson v. State, 78 Okla. Cr. 160, 145 P. 2d 774.

We call attention to the case of In re Tuggle (In re Opinion of the Judges), supra, in which Judge Doyle stated [70 Okla. Cr. 83, 104 P. 2d 730]:

"Penal Code, sec. 2222, 21 Okla. St. Ann. § 707, provides as follows:

" 'Every person convicted of murder shall suffer death, or imprisonment at hard labor in the State Penitentiary for life, at the discretion of the jury. Upon trial of an indictment for murder, the jury, if they find the defendant guilty, must designate in their verdict whether he shall be punished by death or imprisonment for life at hard labor, and the judgment of the court shall be in accordance therewith. But upon a plea of guilty the court shall determine the same.'

"The first question presented for our consideration is whether, according to a proper judicial construction, the concluding clause of the above section authorizes the district court to pronounce and enter a judgment of death upon a defendant's plea of guilty, or whether, on the contrary, it _s necessary under the statute to submit the question whether he shall be punished by death or imprisonment for life at hard labor to the discretion of a jury.

"There is no reason why this provision of the Penal Code is not constitutional and valid. A conviction of crime may be had in three ways: either by the verdict .

of a jury, or by findings of fact, by the judge where a jury is waived, sec. 20, art. VII, Const., Okla. St. Ann., or by a plea of guilty. Where a defendant who is indicted or informed against for a capital crime in a court of competent jurisdiction pleads guilty, the court is authorized to pronounce judgment and sentence against such defendant according to law. The authority thus granted is not in any degree affected or controlled by the previous provisions contained in said sec. 2222, supra, that:

" 'Every person convicted of murder shall suffer death, or imprisonment at hard labor in the State Penitentiary for life, at the discretion of the jury.'

"And that:

" 'Upon trial of an indictment for murder, the jury, if they find the defendant guilty, must designate in their verdict whether he shall be punished by death or imprisonment for life at hard labor, and the judgment of the court shall be in accordance therewith.'

"The foregoing provisions apply only to cases where there is a trial upon an indictment or information for murder on a general plea of not guilty.

"It is evident that the foregoing provisions of our Penal Code were not designed to abrogate the well-established rule of the common law, by which a party indicted for an offense, however grave in nature, may enter a plea of guilty thereto, if he sees fit so to do. In such cases there is no issue to be submitted to a jury on which a verdict can be founded. All that the court is required to do is to render judgment and sentence imposing punishment as prescribed by law for the crime committed. Opinion of the Judges, 6 Okla. Cr. 18, 115 P. 1028; Opinion of the Judges, 18 Okla. Cr. 20, 192 P. 597."

This was a death penalty case, entered upon a plea of guilty, and the case was later appealed to this court and affirmed in an opinoin by Judge Jones. Tuggle v. State, supra.

In the case of Ex parte Gilbert, supra, we quoted from two of the early cases. In Starr v. State, 5 Okla. Cr. 440, 115 P. 356, 367, the court says:

"Generally speaking, the constitutional provisions guaranteeing to every accused person in a criminal action certain rights may be separated into two classes. First, those in which the public generally, and as a community, is interested, as well as the accused, and which are jurisdictional as affecting the power of the court to try the cause, second, those more in the nature of privileges which are for the benefit of the accused alone, and do not affect the general public. The former cannot be waived. Jurisdiction to try the cause is conferred by the law. Consent cannot confer jurisdiction, but the accused may waive a constitutional right or privilege designed for his protection, where no question of public policy is involved. The public as well as the accused have an interest in every criminal trial. The life and liberty of the citizen is a matter of supreme importance to the state, and it should not allow him to throw either away by a failure, intentional or otherwise, to take advantage of his constitutional safeguards. It will not do, however, to say that because the state has a peculiar interest in protecting the citizen accused of crime to the extent of his constitutional rights that he shall in no case be allowed to waive them, for in some cases it may be to his interest to waive them, and the denial of the right to do so would defeat the very object in view when the rights were given, and cause them to operate to the injury rather than to the benefit of the accused. . . .

"Where a constitutional right in a criminal cause is largely for the benefit of the accused or in the nature of a personal privilege, the law is well settled that an accused may waive such right. In the case of State v. Adams, 20 Kan. 311, Mr. Justice Brewer said:

" ' . . . His right to meet the witnesses face to face he had waived. So, while he is entitled to have counsel, he is not compelled to have them. He has a right to

a subpoena for his witnesses, but he is not obliged to have one issued. And the record need not show that these privileges or rights were formally tendered to him and formally declined, or that an express waiver was signed. It is enough if it does not appear that they were denied when he applied for them.' "

And in the case of State v. Frisbee, 8 Okla. Cr. 406, 127 P. 1091, 1095, the court, after citing and reviewing many cases bearing upon this proposition, says:

"The principles announced in these cases meet our entire approval, and they are here reaffirmed. It is a well-settled principle of law, recognized by all appellate courts, that every one may waive a right intended for his own benefit if it can be relinquished without affecting the legal rights of others and without detriment to the community at large. See Reid v. Field, 83 Va. 26, 1 S. E. 395. The right of waiver extends to and includes all descriptions of contractional, statutory, and constitutional rights, except such as are inalienable. An examination of the following cases will show that they fully support the preceding statement: State v. Mitchell, 119 N. C. 784, 25 S. E. 783, 1020; Butler v. State, 97 Ind. 378; Williams v. State, 61 Wis. 281, 21 N. W. 56; Allen v. State, 16 Tex. App. 237; State v. Olds, 106 Iowa 110, 76 N. W. 644; State v. Sackett, 39 Minn. 69, 38 N. W. 773; State v. Polson, 29 Iowa 133; People v. Murray, 52 Mich. 288, 17 N.W. 843; Commonwealth v. Dailey et al., 12 Cush., Mass., 80; State v. Fooks, 65 Iowa 196, 452, 21 N. W. 561, 773; Connelly v. State, 60 Ala. 89, 31 Am. Rep. 34. * * *

"The public policy of this state as evinced by the Constitution of the state, the legislative enactments, and the repeated decisions of this court is to the effect that the spirit and reason of the law should control rather than that the cold, technical letter of the law should be enforced. We cannot bring ourselves to believe that a provision of our Constitution which was intended solely for the purpose of assisting a defendant to prepare for

trial in order that justice might be done should be so construed as to make it a means for the defeat of justice and as a refuge for criminals and a protection for crime. A little reflection will show that the construction placed upon this provision of the Constitution by the trial judge would have directly the opposite effect from that intended. A defendant and his attorneys must of necessity know, when they announce ready for trial, as to whether or not a copy of the list of witnesses with their post office addresses, intended to be used by the state in chief, has been furnished to the defendant or his counsel. If they were permitted, when no such list had been furnished them, not only to remain silent on this question, but announce ready for trial, and permit a jury to be impaneled and sworn and jeopardy to attach, and then object to the reception of any testimony because they had not been served with a copy of the list of such witnesses, it would enable them to take advantage of their own wrong, and it would work the rankest kind of injustice to the state. When a defendant voluntarily announces ready for trial, this operates as a waiver of all preliminary steps prescribed for preparation for trial."

In both the Starr and Frisbee cases supra, the court quoted from the case of Perteet v. People, 70 Ill. 171, as follows:

"A prisoner, in a capital case, is not to be presumed to waive any of his rights, but that he may, by express consent, admit them all away, can be neither doubted nor denied. He may certainly plead guilty, and thus deprive himself of one of the most valuable rights secured to the citizen, that of a trial by jury. If he can expressly admit away the whole case, then it follows that he can admit away part of it, but will not be presumed to have done so. The consent must be expressly shown."

In the very recent case of Ex parte Gault, 78 Okla. Cr. 172, 146 P. 2d 133, 136, we have had this question under consideration, and there said (quoting from the case of Ex parte Meadows, supra):

"Under Bill of Rights, sec. 20 (article 2), Okla. St. Ann. Const., an accused has the right to consult with counsel and to be fully advised as to his rights, and as to the consequences of his act before entering his plea to the indictment or information.

"A plea of guilty should be entirely voluntary, and should be made by one competent to know the consequences thereof, and should not be accepted until after the defendant has been fully advised by the court of his rights and the consequences of his plea.

"A person prosecuted for a crime may waive the rights guaranteed to him by Bill of Rights, relating to trial by jury, right to be heard by counsel, etc.

"Whether one accused of crime has waived his right to the assistance of counsel for his defense must depend in each case upon the particular facts and circumstances surrounding that case, including the backgound, experience, and conduct of the accused."

And it was further held:

"The constitutional provisions guaranteeing to every person in a criminal action certain rights are: First, those in which the public generally, and as a community, is interested, as well as the accused, and which are jurisdictional as affecting the power of the court to try the cause; second, those more in the nature of privileges which are for the benefit of the accused alone, and do not affect the general public. The former may not be waived, the latter may.

"Among the legal safeguards which have been adopted for the benefit of the accused, which may be waived, are the following: The right to have twenty-four hours in which to plead after arraignment; the right to be furnished with a copy of the information; the right to forty-eight hours after conviction before sentence may be passed; the right to be confronted by the witnesses; the right to trial by jury; the right to have counsel to represent him; the right to a subpoena for his witnesses. Ex parte Gilbert, 71 Okla. Cr. 268, 111 P. 2d 205.

"The only consideration for this court is whether, under the facts in the instant case, there was an intelligent waiver of these rights. We think this must be answered in the affirmative."

It will thus be seen that from the early decisions of this court, which have been followed by the later decisions, the rule of one's right to enter a plea of guilty and waive his constitutional or statutory rights as was done in this case, has been firmly established. Here there can be no doubt of the guilt of the defendant. The evidence is overwhelming. He entered a plea of guilty at the time he was arraigned for preliminary examination. He made a written statement which was purely voluntary. He did this without fear or compulsion. He entered his plea of guilty in the district court after he had been fully advised of his constitutional rights by the court; after two able attorneys had been appointed to defend him; and after conferring with and being informed by his attorneys of the probable consequences of such plea. And he reiterated to the court his desire to enter a plea of guilty, and this plea was then accepted by the court, and defendant was assessed the death penalty. This was not done until after testimony had been taken and the court was fully informed of all the facts. A reading of these facts clearly justifies the sentence imposed. The victim was followed by the defendant from the place where she was working. It was after midnight. She was not only assaulted, but raped, cut, robbed, shot in the mouth with an automatic pistol, after being dragged for some distance, and left for dead with a knife sticking in her throat. This was one of the most brutal crimes ever perpetrated in this state. It was, in our opinion, to cover such cases as this that the statute was enacted permitting the giving of the death penalty for first degree rape. As above stated, we do not approve of too hasty action by the courts

in disposing of cases of this character to the end that a defendant may be denied of his constitutional or statutory rights, but we find that under the law he has not been denied those rights in the instant case.

Upon the suggestion at the time of the first oral argument of this case upon appeal to this court, that outside influence might have been had at the time defendant was sentenced, this court ordered a hearing before the trial court, and the evidence at such hearing abundantly shows that there was no interference on the part of the public, and that the trial court, prior the sentencing of defendant, had no knowledge that anyone had appeared at the jail demanding that defendant be turned over to them; and that defendant was given a fair and impartial hearing; and that the judgment and sentence imposed by the court should be upheld. A retrial of this case could, in our opinion, only result in the same judgment and sentence, upon the facts presented.

It is therefore ordered that the judgment and sentence of the district court of Murray county be affirmed.

The time originally appointed for the execution of Cliff Thomas Norman having passed pending this appeal, it is ordered, adjudged and decreed by this court that the judgment and sentence of the district court of Murray county be carried out by the electrocution of the defendant, Cliff Thomas Norman, by the warden of the State Penitentiary, at McAlester, Oklahoma, on Friday, the 21st day of September, 1945.

JONES, J., concurs. DOYLE, J., not participating.