## ISOM WILLIAMS et al. v. STATE.

No. A-10964.    April 13, 1949.
(205 P. 2d 524.)

96

Alan B. McPheron and Roy Paul, both of Durant, for plaintiffs in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., and W. H. Parker, Co. Atty., Atoka County, of Atoka, for defendant in error.

BAREFOOT, J. Defendants, Isom Williams and Edward Lewis, were charged in the district court of Atoka county with the crime of murder, entered pleas of guilty, and were each sentenced by the court to be executed, and have appealed.

Counsel for defendants have presented five specifications of error which it is contended require a reversal or modification of the judgments and sentences entered in this case. They are:

"Proposition I—Failure of the arresting officer to take defendants before an examining magistrate to be dealt with according to law was a denial of due process of law as guaranteed by Title 22, Section 181, O.S.A., and the Constitution of the State of Oklahoma and the Constitution of the United States of America.

"Proposition II—The purported confessions of the two defendants taken by the officers were not voluntary, but were given as a result of fear and oppression and the admission of said purported confession in evidence was a denial of due process of law as guaranteed by the Statutes of the State of Oklahoma, the State Constitution, and the Constitution of the United States and therefore reversible error.

"Proposition III—Failure of the trial court to afford counsel appointed by the court reasonable time to investigate the facts, examine the law applicable and to prepare for arraignment and trial.

"Proposition IV—Bias, prejudice and interest of the trial court were a denial of defendants' rights to a trial before a fair and impartial judge and therefore reversible error.

"Proposition V—That the judgment and sentence was excessive and the ends of justice would be met by a lighter sentence and in alternative, if said case is not reversed, the judgment and sentence should be commuted to life imprisonment."

For a proper consideration of this case and the errors presented, it is necessary that a statement of the facts, as revealed by the record, be given, and when this is done, the errors may be considered together.

The record discloses that defendants are both full-blood Choctaw Indians, ages 38 and 37, respectively, and both had for many years been residents of Atoka county. They are charged with the murder of W. E. Wallace, of Atoka, an old man about 86 years of age, who was in bad physical condition, crippled and unable to care for himself. He was suffering from arthritis, and lived alone in a small two-room shack near the business district in Atoka, and this was the scene of the killing. He had a daughter living in Atoka, Mrs. Ted (Laura) Copeland, who visited his place several times each week, and looked after him. She was at his house on Saturday afternoon, April 26, 1947, about 6 o'clock, and testified that her father was in worse condition than he had been in 35 years. She returned to his home on Sunday afternoon about 2 o'clock, and found her father lying on the floor. He had been attacked in his home, beaten about the head, apparently with fists, and had been choked. He had been knocked down, and his head struck the bed-post. He was taken to hospital, and died about 1:30 on Monday, April 28, 1947, from the effects of the wounds he had received.

Defendant Isom Williams was arrested by Deputy Sheriff F. B. (Bob) Wheeler at his home 10 miles north and three miles east of Atoka on Sunday April 27, about 4:30 in the afternoon; and defendant Edward Lewis was arrested on the highway in close proximity to the home of Isom Williams just before dark, the same day. Both of the defendants were placed in the county jail,

but in separate cells, and were later charged with the murder of Mr. Wallace.

These defendants were questioned after they had been placed in jail by Deputy Sheriff F. B. (Bob) Wheeler who had arrested them, and both denied that they had killed the deceased, or that they were acquainted with him.

L. O. McBride, the sheriff of Atoka county, was absent in Texas on official business at the time defendants were arrested. He returned to his office on Tuesday, April 29, 1947, and at once began the investigation of this crime. On the morning of his return, the sheriff talked to both defendants, and they both denied that they knew anything about the killing of Mr. Wallace. Just before noon on Tuesday, April 29, 1947, Sheriff McBride, in company with a special deputy sheriff, A. A. (Tony) Rozniak, first took defendant Edward Lewis from the jail to the funeral home in Atoka where the body of deceased had been prepared for burial and was being held. About 20 minutes after returning Lewis to the county jail, they took the defendant Isom Williams from the county jail to the funeral home to view the body of deceased. The testimony of the sheriff was to the effect that he took these defendants to the funeral home for the purpose of trying to get them to confess to the killing of the deceased. He had each of them hold his hands close to the body of deceased, and he could tell by the facial expression of the defendant Edward Lewis that he was affected by this action. Both of the defendants, while at the funeral home, denied that they had killed Mr. Wallace and denied that they knew him. Soon after the defendant Lewis was returned to jail, he made a written statement to the sheriff. It is as follows:

"Edward Lewis, after being warned by Sheriff L. O. McBride, that any statement he made would be used against him and not for him, made the following voluntary statement:

"My name is Edward Lewis. I am 37 years old and live in Atoka, Oklahoma. On Saturday night, April 26th, 1947, I was with Isom Williams in Atoka, Oklahoma. About 11 P. M. he and I went to the house of Mr. Wallace, I do not know his given name. I knocked on the door and Mr. Wallace asked who it was. I told him who it was. I said Lewis and Williams. Mr. Wallace then opened the door and we went in. I asked him for 50 cents, and he ran his hand in his pocket as if feeling for change, and said he didn't have any change. Then Isom Williams struck at him, striking him in the face. Mr. Wallace fell backward and before he hit the floor Isom struck him again. Mr. Wallace was then on the floor, and Isom told me to hold him. I caught him kinder by the throat and lower jaw, and suppose I choked him. While I was holding him Isom Williams was going through his pockets.

"After Isom got through searching Mr. Wallace he said to me, 'Let's take off.' We left Mr. Wallace lying on the floor. He was not moving. I do not know whether he was conscious or not, but he did not look like he was conscious. We went from there to J. T. William's, we then went to Ellery Davis', and from there to Albert Byington's. We both spent the rest of the night at Albert Byington's. I left Albert Byington's and came to Cate's drugstore and got a bottle of bay rum. I paid 60 cents for it. I got 30 cents from Ellery Davis and 30 cents from Isom Williams. I went back to Albert Byington's and we, that is, Isom Williams, Jim Lewis and I came back to Cates' drugstore and got more bay rum. Isom bought it and paid 60 cents for it. Then Isom and I went /to/ a beer joint near the lumber yard. I do not know who runs it but it is run by a negro and is in an unpainted wooden building near the lumber yard. There Isom bought me two small bottles of beer; then he bought a quart of beer and then another small bottle.

Then Isom began playing dominos. We stayed there about a hour. This was on Sunday morning, April 27th. Isom and I then went to the highway, and Isom told me if I caught a ride to pick him up, and he walked on down the road. The highway was No. 3 east of Atoka. I caught a ride with a man who said he was going to Hugo. I do not know who he was. We picked Isom up and he and I got off at Lane. Isom went on to his home and told me to come on there. I did not go to Isom's home, but went to Bailey's store on the highway. I left Bailey's store and went to Mary Anderson's. I left Mary Anderson's and was going up the highway when Mr. Stewart, the deputy sheriff picked me up and brought me to Atoka.

"I have known Mr. Wallace, the man about whom I have made this statement, for some time, but did not know his given name. I did not see Isom with anything that he got off Mr. Wallace, but he had chances to hide it when I was not with him.

"I am making this statement of my own free will and I have not been either threatened or promised anything to make it. I have not been promised any leniency or anything.

"I will state further that Sunday morning about 8:30 I went to the Cotton Hospital to see if my baby was there, but it was not there. I talked to some woman who I took to be a nurse about my baby. Dr. Cotton was there also and talked to me about my baby.

"Dated this the 29th day of April, 1947.

"(Signed) Edward Lewis.

"Witnesses to signature:

"C. H. Jackson
"L. C. Beard
"L. O. McBride
"A. A. Rozniak

"Subscribed and sworn to before me this the 29th day of April, 1947.

"(Seal)                    (Signed)    Margaret Akers
              "Court Clerk, Atoka County, Oklahoma."

On the night of April 29, 1947, some time between 10 o'clock and midnight, Sheriff McBride and Special Deputy Tony Rozniak took the defendant Isom Williams to the home of deceased, where the crime occurred. The house was dark, there was blood and the broken dental plate of deceased still on the floor. The bed was unmade. They removed the mattress, and Sheriff McBride hand-cuffed Isom Williams to the bedpost, and told him he would be left there until the next morning, or until he decided to talk. The sheriff left the premises and went to his home, but left Rozniak near the premises to convey word to him if the defendant desired to talk to him. The sheriff also advised Luke C. Beard who ran a small restaurant near the house of deceased, what he had done, so that he would know what was going on. About 4 o'clock in the morning, Isom Williams called to Special Deputy Tony Rozniak that he desired to talk to the sheriff, and the deputy took him to the home of the sheriff, and they all went immediately to the sheriff's office and defendant Isom Williams made an oral statement to the sheriff, which was later reduced to writing and sworn to before the court clerk on the morning of April 30, 1947. This statement is as follows:

"Atoka, Oklahoma
"April. 30. 1947.

"Statement of Isom Williams. Made freely and voluntary without threat are fear are promas of any leanecy AO any kind. After being warned buy Sheriff L. O. McBride of Atoka Co. Oklahoma.

"My name is—

"I Isom Williams I am 38. years of age and on Saturday nite of April 26th 1947. About 11.30. p. m. my self Isom Williams and Ed Lewis went to the home of. Wallace and Ed Lewis knocked on Mr Wallace door and Mr Wallace ask ho it was Ed Lewis said this is Lewis and Williams So Mr Wallace got up and opened the door and ask us to come in We walked in side of Mr Wallaces house and Ed Lewis asked Mr Wallace for fifty cents. Mr Wallace ran his hands in his pockets and said he didn't have any change Then I struck Mr Wallace twice in the face are. on the head I knocked him down Mr Wallace fell backerd and I said to RD Lewis hold him So Ed Lewis got down on the old man Mr Wallace and caught him buy the throat and I suposed he choked Mr Wallace I never saw Mr Wallace move after we got up off him. I taken it from the way I saw it Ed Lewis used both hands kindly around Mr. Wallaces throat choking him.

"I do not know Mr. Wallace first name After Ed Lewis got a stratle of Mr. Wallace and while he was liwing on the floor I Isom Williams searched the old man Mr Wallace for money. I Isom Williams in my serch got $380 Cts out of Mr watch pocket to the best of my rememberence this is all the money I could find we wasnt there at Mr Wallaces house about five minutes, When I struck Mr. Wallace knocking him backerd he fell hiting his head againce one of the bed ledges the back if. Mr. Wallace head struck the bed post at one corner of the bed I then said to Ed Lewis lets get out of here then Ed Lewis said lets finish him we both Ed Lewis and my self left Mr Wallace place and we went from Mr Wallaces place to Albert Byington home and from Byington house to a dise game where a boy buy the name of Elrey Davis lives we stayed there about hour and a half are tow hours We then went back down to Albert Byington house and stayed the rest of the nite There next morning we sent to town and got some bayrum and the second time me Isom Williams and Ed Lewis and Jim Lewis came back to town and got some bay

rum after this we three Isom Williams Ed Lewis and Jim Lewis went to a place I think is called Velm Drive In We Caught a taxi out there I Think it was surell taxi Then we caught a ride back to town We all three got out in the South part of town on the street that goes East toward the Gen in the City of Atoka Oklahoma Just before we went to the Cafa we went to the Cottons Hospital in Atoka Okla and Ed Lewis went in side myself and Jim Lewis wated out side and then back to where we got out of the pickup myself and Ed Lewis went to a beer joint across the track It was not for from a lumber yard. I Isom Williams baught one big bottle of beer and three little ones. I played some Domanoes and then me and Ed Lewis and Jake Howard Was at Prichard filling station When we got up there this filling station is on Highway No. 3 going East out of Atoka Oklahoma We left Ed Lewis at the filling station and he caught a ride first I Told him if he got a ride to stop and pick me and Jack Howard and David Allen up. David Allen and Jake Howard both was at the Prichard filling station on Highway No. 3 going East out of Atoka Oklahoma We all four got off at Lane Oklahoma Then me and Jake Howard and John Daney Went on down to my place about tow miles East of Lane Oklahoma and about one quarter North to where I live We had just got home when Mr Bob Wheeler and Art Johnson came after me I knew in my mind what the officers were coming after me for when I saw them drive up but I hadent told any body elce about what me and Ed Lewis had don.

"I am making this statement freely and volentary without threat are fear are without the promess of any kind.

"After Mr L. O. McBride Sheriff of Atoka Co Oklahoma has warned me of all my rights and told me what ever I said in this statement could bee used againce me and not for me

"Dated this the 30th day of April 1947.

"(Signed)
"Isom Williams
Isom Williams

"Witnesses:

"J. O. Stewart
"Glen T. Jones
"A. T. Ellison
"A. A. Rozniak

"Subscribed and sworn to before me this the 30th day of April, 1947.

"(Signed)    Margaret Akers, Court Clerk."

A complaint was filed in the county court of Atoka county against the defendants on Thursday, May 1, 1947, charging them with the murder of W. E. Wallace. They were brought before the county judge sitting as an examining magistrate on the same date, waived preliminary hearing and entered pleas of guilty. The following order was entered by the county judge:

"Now on this the 1st. day of May, 1947, the defendants herein Isom Williams and Edward Lewis the undersigned, County Judge of Atoka County, Oklahoma, sitting as an Examining Magistrate, upon the charge of murder as set forth in the within and foregoing Information.

"The defendants each appeared in his proper person, and the State appeared by W. H. Parker, the County Attorney of Atoka County, State of Oklahoma, and the State, through its said County Attorney announced ready for the arraigning of the said defendants.

"And thereupon this Court inquired of defendants if they were represented by attorney, and they stated they were not. Whereupon this court informed the said defendants of their right to have an attorney to represent them and of their right to a preliminary trial, where-

upon each of said defendants, in open court, stated they did not desire to be represented by an attorney and they desired their pleas of guilty to stand, and each waived the right of preliminary trial.

"It is, therefore, the order and judgment of this court that the said defendants, Isom Williams and Edward Lewis, and each of them, be held to answer to the charge of murder, to the district court of Atoka County, State of Oklahoma, and that they be held in the custody of the sheriff of Atoka County, Oklahoma, pending their trial before the district court of said county, without bond.

"(Signed)    J. B. Maxey, County Judge."

On the same day, Thursday, May 1, 1947, an informa- tion was filed in the district court of Atoka county, charging defendants with the crime of murder. On Friday, May 2, 1947, defendants were taken before District Judge Sam Sullivan of Atoka county for arraignment. The records of the court reveal that on this date an attorney, Mr. Gilbert W. Daney, a former county judge of Atoka county, and a member of the Atoka County Bar was appointed by the court to represent the defendants. He was present with the defendants in court at the time of their arraignment, and at the time both defendants entered pleas of guilty. He made the following statement to the court:

"Mr. Daney: The only thing I can say is that the two boys were crazy and didn't know what they were doing, by reason of drinking liquor or something else. And I can't plead too much for them. They were drunk and are full blood Indians. Sometimes people do things and are sad about it, but you can't bring back the things that are done. If they did it I don't know . The only reason I am making the plea is that they are ready to enter their plea. In other words they have made up their minds that they are going to take what the court

108

gives them. Judge Sullivan: You have been advised by the County Attorney that you don't have to enter any kind of a plea. You have also been advised that anything you say can be used against you. You don't have to make a statement of any kind. Q. Are you Isom Williams? A. Yes. Q. There hasn't been any threats made to you? Has anyone struck you or beaten you? A. No, sir, they haven't. Q. You have been treated kind and decent? A. Yes. Q. Do either of you boys have any statement to make before entering a plea? You are charged with the crime of the murder of W. E. Wallace. You may enter a plea of guilty, not guilty, or you don't have to enter a plea at all. Edward Lewis: I plead guilty. Q. You are charged with the murder of W. E. Wallace in Atoka, Oklahoma, on the 28th of April. You don't have to plead at all, neither a plea of not guilty or a plea of guilty. How do you plea? Isom Williams: Well, I don't know. Not guilty. Mr. Parker, County Attorney: Q. You want your plea of not guilty to stand? A. I want it to stand. Mr. G. W. Daney: Q. Now, Isom, have you had time to think about this? A. I have. Could I plead guilty now or could I plead guilty later? Judge Sullivan: I will not sentence you now. Isom Williams: I plead guilty. Judge Sullivan: Do you have any statement you want to make in defense of your statment of not guilty? A. I wasn't even with Ed when it happened, but when I got in jail he asked me. They took me down there and tried to scare me. Tony, he took me down there, he and Mr. McBride and put handcuffs on me and tied me to a bed. They took the mattress off and put me on a slat and they put me there and told me not to go to sleep. He asked me again and I told him I didn't know nothing. He said he was going to shoot my brains out. They went out and left me in the house. The screen door was shut and he told me to holler for help if anything happened. After while the two guys came and tried to break in and I didn't say anything. They tried to break the screen window. After while I hollered help and Tony came. He said he was going to kill me if I didn't tell, so I said I will.

They just got me scared. Ed had the papers that he wrote down. McBride read it to me that day. I wasn't with him. I just got scared and I told him I was with him. They scared me, that is the reason I told him that. I will just plead guilty and go on. Judge Sullivan: Was Isom with you that night? Edward Lewis: Yes, sir. Q. He was with you when you went to the house where W. E. Wallace was asleep? A. Yes, sir. Q. Ed, when you got in the door, who struck Mr. Wallace the first two blows? A. Isom Williams. Q. Ed, when you started down there you knew you were going to Mr. Wallace's house, didn't you? A. Yes. Q. And there was an agreement between you and Isom as to what you would do? A. We were over there trying to borrow some money. I knocked on the door and he got up and opened the door. He said who was there and I asked him for four bits. He reached in his pocket and that is when it started. Q. You started fighting? A. He struck him twice. After he fell he told me to hold him. Q. Was it Isom who searched him? A. He must have searched him. I didn't look back. Q. Did anyone force you to get your confession? A. No. Q. Who left the house first after the killing? A. He did. Q. Who turned the light out? A. I don't know. Q. Did you pull the door to? A. No, sir. Q. You left the door open? A. I don't know. Q. How much money did Isom get? A. I don't know. Q. Where did you go when you left the house? A. We went around the tie yard. Q. Where did Isom Williams go? A. I didn't see. Q. Which direction did he go after leaving you on Ohio Street? A. I don't know. Q. You went south, which way did Isom go? A. Both of us went to the tie yard. Q. Which way did he go? A. I didn't see him. Q. You went across the Katy tracks? A. I went to Graymon's. He was up there at Graymon's. Mr. Gilbert W. Daney: Was there an understanding between you that you were going to do this? Was there an understanding? A. No, sir. Judge Sullivan: Ed, in your confession you stated that when you got in there you were to punch Isom and Isom was to hit him? A. No. Q. He hit him voluntarily? A. Yes. Q. He hit

him two times before you punched him? A. I didn't punch him. Q. You didn't get any of the money? A. No. Did you see him get some? A. I didn't see what he got or— Q. Do you know he got any money at all? A. No. Q. Did you have any money with you when you went to Velma's place the next morning? A. I didn't. Q. Did he? A. I don't know. He bought me two bottles. Q. That is right, he had money the next morning? A. Yes. Isom Williams: Well, I plead guilty. Judge Sullivan: You heard Ed's statement. Is that true? A. Yes. Q. You did go with Edward Lewis? A. Yes. Q. About what time? A. I don't know. Q. The light was on about 11:00 o'clock. Was the light on when you went to the door? A. I didn't think it was. Q. Was the light on when you left? A. I thought he turned the light off. He said he did and pulled the door to. Mr. Daney: You went in first? A. He did. Q. You went in behind him? A. Yes. Q. You stood to the right? A. Yes. Q. You hit Mr. Wallace twice? A. Yes. Judge Sullivan: Q. You hit him twice like this with one hand? A. No, with the left and then the right. Q. That is when he fell and struck his head? A. Yes. Q. That is when you told Edward to grab him? A. Yes, when he straddled him. Q. That is when you went through his pockets? A. Yes. Q. How much money did you get? A. $3.80. Q. You did strike him two blows? A. Yes. Q. Did Ed hit him any more? A. I think he did. Q. After you got the $3.80 did you give him any at all? A. No. Q. You got out first? A. Yes. Q. He turned the light out and came out side? A. I think he turned the light out. Q. Where did you go from the produce house? A. I came back to town and got with Graymon and we went to his house and played cards. Q. He went south? A. Yes. Q. Was he running? A. No, he just walked. Q. When you left Graymon's you went to Ellery Davis? A. Yes. Q. How much money did you lose in the crap game? A. Won about fifty cents. Q. You spent the night at Maggie Byington's? A. Yes. Q. Your uncle—Lewis, who lives down by Achilee, was there too? A. Yes. Q. What time did you get up Sunday morning? A. I don't just

know what time. Q. About 7:30 or 8:00 I guess. He went back and borrowed 30 cents more on the bag? A. I don't know. I walked and got 30 cents. Q. Then you walked over to Velma's place? A. Yes. Q. And that is where you caught the taxi and came to town? A. Yes. Q. You then went and played dominoes? A. Yes. Q. What time did you catch a car to Lane? A. About 1:30 or 2:00. Q. What time did Mr. Wheeler arrest you? A. About 3:20. Q. Did you know why he was arresting you? A. Yes. Q. Is that about what happened, Ed? Edward Lewis: A. Yes, sir. He got me later. Q. You jumped over the fence and ran? A. But, I didn't run. Q. When did he arrest you? A. Five-thirty or six or something like that. Q. He didn't promise you any reward to sign this statement? A. No. Q. Is this statement true to the best of your rememberance? A. Yes. Q. You know what was on the paper you signed? A. Yes. Q. I haven't tried to mislead or deceive you in any way, have I? A. No. Q. You realize he died because of that beating? A. Yes. Q. Do either of you have anything you want to say? Isom Williams: No, I guess not. Edward Lewis: No. Judge Sullivan: Q. If you have anything where the court can be merciful I would like to hear it. You have told the truth and the whole truth and you two did commit this crime? A. Yes. Q. Did you unbutton his shirt? A. No, sir. Q. You got the $3.80 out of his watch pocket? A. Yes. Q. He had three bills and 80 cents in change? A. Yes. Q. You left 10 cents? A. Yes. Q. If either have anything to enlarge upon, to say at this time, you have that right. Edward Lewis: I don't think I have anything to say. Q. Isom, did you give him any of that money? Isom Williams: I think I gave him some. I remember giving him a nickel Sunday morning. He said if he had a nickel we could go get some bay rum. He said he had 55 cents and said he lacked a nickel having enough. Mr. Daney: Where did you get the sixty cents? Edward Lewis: From Lee Folsom, Sunday morning. Judge Sullivan: Q. Lee was with you a while Saturday night? A. I don't know. Q. Mose Junior was with you at the crap game? A. Yes.

Q. There was a negro woman in bed where you were shooting craps? A. There was someone in bed. Q. Well, it was a small room and you know someone was in the bed? A. Yes. Q. The court would like for you to elaborate on the subject. Edward Lewis: I don't have anything to say. Isom Williams: I don't have anything to say either. Q. Did you know Mr. Wallace? Edward Lewis: Yes. Isom Williams: I didn't know him before that. Q. You asked him to loan you fifty cents? A. Yes. Q. You thought he was taking too much time feeling for the change and then you hit him? A. Yes. Q. If there is anything you want to add please feel free to say it. Mr. Daney: Had you known him before? Isom Williams: No. Edward Lewis: Not too long. Q. You weren't sore at him, or mad? Edward Lewis: No. Isom Williams: No."

The minutes of the court then reveal the following:

"Thereupon, after further statements and taking of testimony in open court, the defendant, Isom Williams, in person and by counsel withdraws his plea of not guilty and enters his plea of guilty to the charge of murder.

"The plea of guilty by the said defendant, Edward Lewis, is considered and accepted by the court.

"The plea of guilty by the said defendant, Isom Williams, is considered and accepted by the court.

"Thereupon, in open court the court ordered and set Monday, May 5, 1947, at nine o'clock a. m., for sentencing of the defendant Isom Williams and the defendant Edward Lewis."

On Monday, May 5, 1947, defendants Isom, Williams and Edward Lewis, in company with their attorney, G. W. Daney, were brought before the court for sentence.

Before entering sentence, the court took testimony of numerous witnesses, among them that of Sheriff L. O. McBride, Dr. W. W. Cotton, L. C. Beard, Margaret Akers, court clerk, T. Cope, B. F. Wheeler, deputy sheriff, and

Mrs. Ted (Laura) Copeland, the daughter of deceased. It is unnecessary to unduly lengthen this opinion by quoting from this evidence. Nothing new was developed thereby.

After hearing this evidence, and considering the statements made by each of the defendants, which were introduced, the court sentenced each of the defendants to be executed in the State Penitentiary at McAlester on Friday, August 1, 1947.

On September 29, 1947, a motion for new trial was filed by Mr. Gilbert W. Daney, attorney for defendants. Among the errors set out, it is contended that the judgments and sentences were excessive.

On October 14, 1947, an application was filed by defendants for permission to file a motion "to set aside arraignment, set aside pleas of guilty, withdraw pleas of guilty, and to set aside judgments and sentences, and for a new trial." This motion was filed by attorneys Gilbert W. Daney, Alan B. McPheron and Roy Paul. An order was immediately entered granting permission to file such motion.

On the same day, October 14, 1947, the defendants filed an application for an order to take the depositions of the defendants, Isom Williams and Edward Lewis, who were at that time confined in the death cell, at the State Penitentiary at McAlester, such depositions to be used on the hearing of the motion filed by defendants.

On October 17, 1947, the county attorney filed a motion to strike the motion for new trial filed September 29, and also the motion filed on October 14. Counsel for defendants thereupon asked permission to file an amended petition for new trial on the ground of newly

discovered evidence, and permission was granted. The amended motion was signed by attorneys Gilbert W. Daney, Alan B. McPheron and Roy Paul. The motion was filed October 17, 1947, and in part reads:

"(7) That the record in this case shows that Gilbert W. Daney was appointed by the court to represent these defendants as they were unable to employ counsel, and on the 2nd day of May, 1947, and at 10:20 a. m., on the 2nd day of May, 1947, the defendants were arraigned in the district court of Atoka County, Oklahoma, and their pleas of guilty finally accepted and said attorney did not have sufficient time to confer with his clients and to investigate the case and determine what should be done in regard to pleading in the case.

"(8) That said defendants were sentenced on the 5th day of May, 1947, and sufficient time had not elapsed since said arraignment to give their attorney, so appointed by the court, a chance to investigate the case and to determine whether their pleas of guilty should be allowed to stand, or whether a motion should be filed to withdraw their pleas of guilty.

"(9) That the alleged crime was committed on the 26th day of April, 1947, and said defendants were arrested on the 27th day of April, 1947, and placed in the jail at Atoka, Oklahoma, and were not allowed to correspond or communicate with anyone on the outside and the purported confessions introduced in this case were not obtained or given by said defendants as required by law.

"(10) That the attorney for the defendants, at the time of the arraignment and at the time they were sentenced, did not know and was not advised as to the circumstances and facts surrounding the taking of the confessions, and whether said confessions were admissible in evidence against said defendants; and said defendants were not advised by their attorney that the purported confessions were not admissible in evidence against

them; and therefore plead guilty under a mistake of
fact, as well as a mistake of law; and sufficient time
was not allowed the attorney of said defendants to com-
plete the investigations of the confessions and the other
facts and circumstances surrounding the taking of the
confessions and the alleged homicide so that he could
intelligently advise said defendants in regard to plead-
ing in this case.

"(11) Your defendants allege to the court that the
confessions were not made by them voluntarily, but were
given by reason of fear and with promise of reward and
under distinct pressure and were not taken in the man-
ner provided by law; and said defendants were not ad-
vised as to their constitutional rights and did not un-
derstand their rights when said purported confessions
were taken from them by the officers; and had they
been advised that said confessions were not admissible
in evidence against them, and had they not been acting
under fear and oppression, they would not have waived
preliminary hearing and would not have entered their
pleas of guilty in the district court.

"(12) That the rights given these defendants un-
der the Constitution of the United States and the State
of Oklahoma have been greatly abused in that they were
not advised of their definite rights, and being full-blood
Choctaw Indians, speaking only in broken English, and
not being allowed to communicate with anyone and be-
ing placed in fear by oppression, signed the purported
confessions without regard to the true facts in the case.

"(13) That said sentence was not pronounced as
required by law and is excessive as shown by the facts
and circumstances of the case.

"(14) That your defendants, both of them, are full-
blood Choctaw Indians and have no education and many
of the words and phrases of the English language are not
understood by them and therefore (they) do not under-
stand the words and phrases used by the courts and the
officers thereof; and they were not advised as to their

rights under the Constitution of the United States and the laws of the State of Oklahoma, and therefore will be deprived of their lives and liberties without due process of law unless judgment and sentence is set aside."

Attached to this motion was an affidavit signed by Mr. Daney, which is as follows:

"Gilbert W. Daney, being first duly sworn, on oath states that as an attorney and member of the Bar of Atoka county, Oklahoma, on the date of May 2, 1947, at about 9:30 a. m., he was appointed by the court to represent the defendants, Isom Williams and Edward Lewis, who were charged with the crime of murder; and that on the same day at 10:20 a. m., he was called into court for the purpose of having the defendants arraigned and to plead; and that he did not have any knowledge of the facts and circumstances surrounding the taking of the purported confessions on file in this case at the time of said arraignment, and at the time the said defendants entered their pleas of guilty, and at the time the defendants were sentenced in this case; and that he only found out the facts in regard to the taking of said purported confessions on or about the 14th day of October, 1947; and that he did not have sufficient time to advise with his clients, who were full-blood Indians, and get all the facts and circumstances surrounding the taking of the confessions and the facts on behalf of the defendants in this case.

"Affiant further states that if he had been advised, or had knowledge of the facts and circumstances of the taking of the purported confessions, he would have advised the said Isom Williams and Edward Lewis that said confessions were not admissible in evidence against them in the trial of this case, because said confessions were not given voluntarily and the defendants were in a state of fear and were being oppressed.

"Dated this the 17th day of October, 1947.

"(Signed)    Gilbert W. Daney."
(Signature, etc., of notary public)

The county attorney asked to amend his motion to strike so as to include this amended motion for new trial; and after argument of counsel, his motion to strike the several motions of defendants was overruled.

Hearing on the amended motion for new trial was had on October 17, 1947. Evidence by the following witnesses was presented by defendants: F. Bob Wheeler, deputy sheriff; Gilbert W. Daney, attorney for defendants; A. A. (Tony) Rozniak, special deputy; L. O. McBride, sheriff; Roy Peters, funeral director. The state called F. Bob Wheeler in rebuttal. It is unnecessary to further refer to this evidence.

At the conclusion of this evidence, both the state and defendants closed as to the introduction of evidence, except the depositions of the defendants which were to be taken on October 18, and which it was agreed should be a part of the evidence on the motion for new trial.

The depositions were filed on October 21, and further hearing was had on October 22, at which time the depositions were introduced.

After a full hearing, the motion for new trial was overruled, and notice was given in open court of the intention of defendants to appeal to the Criminal Court of Appeals. The appeal was filed in this court on October 27, 1947, by petition in error with case-made attached.

There is one other proceeding as revealed by the case-made, and of which defendants complain. It is based upon the acts of the district judge, and the defendants complain that by reason of said acts they did not have a fair and impartial trial. While hearing the evidence on the motion for new trial, and while deputy sheriff F. B. (Bob) Wheeler was being examined, District Judge Sam Sullivan made the following statement:

"On Tuesday afternoon, the 29th of April, Isom Williams asked F. B. Wheeler, the undersheriff to ask me to come down and talk with him. Wheeler went with me and was present the whole time when Isom Williams told me that he wanted to enter a plea of guilty, and discussed how they accomplished the act. I refused to allow him to plead guilty until I had had further time to study the facts and the transcript from the county court.

"By Mr. Paul: Did he tell you how he hit him and everything? The Court: Yes. Mr. Paul: Did you ever talk to Edward Lewis about it? The Court: Edward sent *to* me at this office, and begged me to sentence him, and said, 'I can't close my eyes to sleep. I see that old man I killed.' He said, 'I want you to sentence me,' I said, 'I don't know, until I investigate.' And I said, 'You have the right to a jury trial.' He said, 'A jury will give me the electric chair.' I said, 'What a jury would do is not binding on me.' Mr. Paul: When was that? The Court: Both of them sent for me and sent this man. At first on Monday, I refused to talk to them —on Monday, the 28th, I refused to talk to them. Mr. Paul: Did you all go anywhere that time? The Court: No. Mr. Paul: Did you later? The Court: After Edward had asked me to let him plead guilty and take sentence, I thought I would try to find out about what he was relating. I wanted to know all the facts. So McBride, Edward and I went down there and he showed me the ground. Mr. Paul: Went where? The Court: Down where they killed the old man. Mr. Paul: Who all went? The Court: Edward Lewis and McBride and another fellow who came in there I didn't know, and he went down here and showed us where he hid the gun at the tie yard. Mr. Paul: When was that? The Court: The 28th, the same day. So, the next day they asked me to allow them to plead guilty. They asked me again Wednesday, and Thursday I called your office, Judge Daney, and told you you were appointed on Thursday. Mr. Paul: This time at the cross-tie pile was just one time you were there? The Court: Yes, sir. We went to where they killed the old man. He showed us how

they went in the door; how they got in, and asked for money, and how he promised them money. And as Isom struck the old man, where his head hit, and at the time he straddled the old man and got down and beat the old man. We asked him if he took anything else, and he said they took a pistol. And we went down there, but we never did find it. Mr. Paul: Where was that? The Court: At the cross-tie pile, down the track on the west side. Mr. Paul: Then where did you go? The Court: Then we came back to here. Mr. Paul: Did you all make any further search for the gun at that time? The Court: We searched through the cross-tie pile that time. He walked up and showed us where they hid it. And when we came back here, he said, 'Judge, I wish you would sentence me, even if you give me the electric chair. I see that old man every day.' And I said, 'No.' He sat there and said, 'Judge, I wish you would go ahead and give me the chair. Every time I close my eyes, I see that old man.' Mr. Paul: When you left the cross-tie pile, did you come back or did you go to some houses? The Court: No, the ties are stacked along the right-of-way there."

Edward Lewis, in his deposition taken at the State Penitentiary, testified as follows: (By Mr. McPheron)

"Q. Nothing said to you about a gun? A. Yes; next thing they wanted to know *if a* gun. Q. Who talked to you about that? A. It was Judge Sullivan. Q. What did he say to you? A. Said they got to have that gun, it was a $60 gun. Q. Did he say anything else to you? A. He said he knew that I got it. 'Well,' I told him, I was scared. I says to myself, 'of course, I know it is not true,' but I said, 'All right, I will tell.' So I told. I didn't know, even know nothing about it. Q. What did you tell him? A. I told him I got it. Q. What did you tell him? A. I told him I took it out to the tie-yards. Q. Did you go up to the tie- yards and look for it? A. Yes, sir. Q. Who took you? A. There was McBride, Sullivan and Russell Telle and Nick Stewart. Q. When you got to this tie-yard, did you all get out of the car?

A. Yes, sir. Q. Anything said to you there? A. Not then. Q. Tell what took place? A. We was looking for the gun. They did. I didn't hardly look for it myself, because I knew I didn't take it up there. And Sullivan said Mose Junior saw me going toward the tie-yard. Q. Did you find a gun there in the tie-yard? A. No, sir. Q. What did you do then? A. We fooled around there and looked for the gun for—I don't know how long—and I think it was McBride asked me where the trail goes to, and I said, 'That way, as far as I know,' and he says: 'Where did you go?' Graymon Williams. 'And we stopped at Graymon Williams'. Q. Everybody was in the car, when you got through there at the tie-yard, you went to Williams' house? A. Yes, sir, after we searched around there and got back in the car and went to Graymon Williams'. Q. What did you do there? A. McBride and Judge Sullivan, they got out and went to this house, and they stayed around there talking to the boy a while, and come back and said he said I had the gun. Q. What did you do then? A. Now, they got in the car; they drove to this fellow's, colored boy, 'Hooker' they called him. Q. What did they do there? A. They got out. Q. Who is 'they'? A. Sullivan and McBride, and they went out there in front of the porch and knocked around there, but there was nobody there then, but they saw a woman coming up that way, which was the woman that lived there, and when she come up, they asked her about a gun, and if I had a gun and the woman told them I didn't have any gun when I was there. Q. What did you do then? A. I was sitting in the car, myself. So, they pulled around there and searched, and they went to Albert Byington's house. That is where I was staying. They went and searched the place, and come— Q. Who searched the place? A. McBride and Sullivan. Q. How long were they there? A. About thirty minutes. Then they brought me back. Q. Do you remember what day this was—the same day you signed the statement? A. I don't know. Q. Brought you back and put you in jail, is that right? A. Yes, sir. Q. Then what happened? A. Then they locked me up. Then, I forget which one, Bob Wheeler or McBride, they

got me out of the jail and took me back in the office, and that is when Judge Sullivan asked me about the gun again. Q. What did he say? A. He said I just as well come out and tell it, if I had the gun, and he said if I didn't tell, I knew what was the penalty. Q. What— did he say anything else? A. No, that is all he said. And he said, 'Look me right straight in the eye.' And I did. I said I was telling the truth. Then, If I didn't tell, I knew what the penalty was, so I got scared again. 'Well,' I said, 'Well, I sold this gun to a colored boy, Hooker.' Q. What happened then? A. Judge told McBride to go get this fellow. McBride, he left out. I was still in that room. Q. With Judge Sullivan? A. Yes, sir. And they brought that fellow in. Q. Brought this negro in? A. Yes, sir. Q. His name is Hooker? A. Yes, sir. Q. What happened then? A. The Judge said, 'Edward Lewis did sell you a gun, isn't that right?' and this colored boy told him, said: 'No, sir, this fellow he didn't have no gun. He didn't sell no gun.' He said, 'You just as well come out and tell me the truth.' And he said, 'No, he didn't have no gun. I don't know nothing about a gun.' And he said, 'Well, lock him up.' Q. Lock who up? A. This colored boy and his wife. Q. Do you know how long they kept them in jail? A. No. They kept them in jail as long as I was in there. Q. What else? A. I think that was all. Q. The next day? A. The next day, that is when they brought us up to Judge Sullivan. Q. Anything said about having beat up somebody? A. Yes, Judge asked me if somebody told me to do this. I told him I didn't know. Q. The next morning they took you up before Judge Sullivan? Is that right? A. Yes, sir. Q. This time you plead guilty up there? A. Yes, sir. Q. If you did'nt kill that man, why did you plead guilty? A. Because I didn't have any money, and I was scared and all that."

This is a full and complete statement of the record as to each step taken leading up to the sentencing of these defendants to be executed, and the proceedings thereafter up to the time of the appeal to this court.

This case has been given careful consideration by all the members of this court, as its importance demands. We have come to the conclusion that the judgment and sentence of the district court of Atoka county should be modified from the sentence of death, to life imprisonment for each of said defendants. In reaching this opinion, we have arrived at the following conclusions:

First: That from the record as a whole the defendants are guilty of killing the deceased.

Second: That the pleas of guilty made by the defendants were voluntary statements, and not involuntary, under the law of this state.

Third: That some of the acts of the sheriff of Atoka county as revealed by this record, can not be approved by the Court, especially the taking of the defendants to the funeral home to view the body of deceased, and the taking of defendant Isom Williams to the scene of the killing and handcuffing him to the bed, in an attempt to secure a confession from him.

Fourth: The written confessions made by the defendants, and especially that of the defendant Isom Williams, might have been considered to have been involuntary and inadmissible, but the voluntary action of the defendants in expressing a desire to enter pleas of guilty when before the court and at the preliminary hearing, and the voluntary statements made by them as to their guilt in open court after consultation with counsel where the duress that might have been present when the confessions or statements were obtained is absent, created a situation where the court's consideration of them would not constitute error. We presume the court considered these statements in connection with all of the other facts. In face of the voluntary pleas of guilty and their subsequent

declaration of the facts, the defendants could not complain of the court's consideration of the written confessions.

Fifth: There are many instances in the record which reveal that the trial court wanted to do everything possible to see that the defendants had a fair and impartial hearing. This is especially noted by statements made by him when the defendants were before him, and his overruling of the motion of the county attorney to strike from the files the motions made by attorneys for defendants for a new trial, to set aside the pleas of guilty and judgments and sentences, and his granting of permission to hear evidence offered by defendants on the motion for new trial; and permission to take the depositions of defendants after they had been sentenced and were confined in the death cell at the State Penitentiary. The action of the court in leaving the bench and going with the officers of Atoka county to make a search of the premises, and investigation as to whether a gun had been used, and personally trying to find the same and interrogating the defendants other than when they were before him in court, may not be approved by this Court. We are sure that the action of the court was with the best intention, and as he stated, only for the purpose of permitting him to become more familiar with the facts before entering sentence against the defendants.

The record reveals that Judge Sullivan stated that one of the defendants, Edward Lewis, called him on Monday, April 28, and wanted him to come down and talk to him. That on Tuesday, April 29 (presumably after Edward Lewis had made his written confession to Sheriff McBride), he went to the jail and not only conferred with Lewis, but also went with the sheriff and defendant Lewis to search for a gun, which it was thought had

been in possession of the defendants at the time of the killing, and also went to inspect the premises where the crime was committed. The defendant Lewis was questioned closely by Judge Sullivan at this time with reference to the location of a gun, and other details of the crime, and according to the statement of Judge Sullivan, the defendant Lewis expressed his desire to enter a plea of guilty at once, and stated:

"Judge, I wish you would go ahead and give me the chair. Every time I close my eyes, I see that old man."

The statement of Judge Sullivan is corroborated by the testimony of Deputy Sheriff Bob Wheeler, who was with him at the time of the investigation above outlined, both as to the facts and the dates.

It will be noted that this investigation by the court was on Tuesday, April 29, 1947. The preliminary complaint was not filed with the county court until Thursday, May 1, 1947, and the information was not filed in the district court until Friday, May 2, 1947. It will thus be noted that the personal investigation by the court was prior to the filing of the preliminary complaint in the county court, filing of the information in the district court, and prior to the entering of the plea of guilty by the defendants. No action had been filed or was pending in the district court at the time this investigation was made by the district judge. The statement of Judge Sullivan that he desired further time to study "the transcript from the County Court" was a mistake, for the reason that there was no transcript from the county court on Tuesday, the 29th day of April, 1947, as the preliminary complaint was not filed in that court until Thursday, May 1, 1947.

This court has upon numerous occasions expressed itself upon the question of the duty and responsibility of the courts of this state with reference to their conduct in cases pending before them.

In the case of Fisk v. Venable, 61 Okla. Cr. 360, 68 P. 2d 425, 429, Judge Doyle, who had many years of service upon this court, in writing the opinion quotes with approval from the Supreme Court of the case of Shearer v. Linebaugh, Judge, 101 Okla. 291, 225 P. 686, 688, as follows:

" 'Section 6, Art. 2, of the Constitution requires that "right and justice shall be administered without sale, denial, delay, or prejudice." The basic principle on which the law rests is that every litigant is entitled to have his rights determined by an impartial and disinterested tribunal, and one that has not prejudged his case. It matters not that a judge is honest, and that he actually believes he can give litigants a fair trial; if he has discussed the merits of a case, and has formed an opinion before a trial, he is bound to enter upon the trial more or less biased and prejudiced. This should not be. Judges should refrain from partisanship in cases pending before them, and should not permit the clamor of the public to warp their judgment. The judiciary is the safeguard of the nation and the state, and the members thereof should so conduct themselves as to inspire the confidence of all, so that every one will feel and know that in the courts their rights will be protected. This confidence cannot exist, if judges persist in discussing out of court the merits of cases pending before them and forming and expressing opinions thereon before a hearing in the orderly course of procedure, and where this has been done the judge should not, in justice to the litigant, insist upon being permitted to sit in the trial of his case.' "

In the case of State ex rel. Harden v. Edwards, Judge, 176 Okla. 187, 56 P. 2d 402, the syllabus by the court reads:

"Courts should scrupulously maintain the right of every litigant to an impartial and disinterested tribunal for the determination of his rights. All are interested in the integrity, independence, and impartiality of the judiciary, the most important and powerful branch of our government. Judges presiding over the courts should be unbiased, impartial, and disinterested in the subject-matter in litigation, and it is of the utmost importance that all doubt or suspicion to the contrary be jealously guarded against, and, if possible, completely eliminated, to the end that we may maintain and give full force and effect to the high ideals and salutary safeguards written in the organic law of the state."

See also Sandlin v. Weston, 162 Okla. 107, 19 P. 2d 361, and Downing v. Venable, 63 Okla. Cr. 461, 76 P. 2d 277.

Each of the above cases was decided upon an application for writ of mandamus to require the trial judge to disqualify in a pending case, and in each instance the writ was granted. The question does not arise here upon a writ of mandamus to prevent the judge from trying the case, but on appeal after he had acted upon a plea of guilty, sentencing defendants to be executed.

Under the cases above cited, we cannot approve the action of Judge Sullivan in making this personal investigation prior to the commencement of any prosecution. We have no doubt that it was with the best of intentions, but the court should take no action which would in any way tend to prejudice him in the trial or sentencing of a defendant. The fact that this personal investigation was made by the court prior to the filing of the preliminary complaint, and prior to the time the information was filed in the district court, could easily have caused the court to be biased or prejudiced either for or against the defendants. From the record as a whole, we do not

consider that this action of the court was sufficient to require a reversal of this case; but we are of the opinion that justice requires that the judgment and sentence of each of the defendants be modified from death by electrocution to imprisonment in the State Penitentiary for life.

With reference to the infliction of the death penalty, this court has spoken in numerous cases. In Noel v. State, 17 Okla. Cr. 308, 188 P. 688, 692, the court said:

"The most solemn and momentous duty courts are called upon to perform in the administration of the criminal law is to inflict the death penalty, and it should be inflicted only in extreme cases, when no other punishment will vindicate the law and protect society against the totally depraved. How careful, then, should we be in reviewing a capital conviction, before we lend our sanction to the taking away of that which, when taken away, we cannot restore. In such cases we must be satisfied that the defendant has been awarded a fair and impartial trial in accordance with the rules of law."

See, also, Mays v. State, 19 Okla. Cr. 102, 197 P. 1064.

And in the case of Easley v. State, 78 Okla. Cr. 1, 143 P. 2d 166, 180, we said:

"Eliminating the defense offered in this case, the facts are not such that justify the inflicting of the death penalty, as shown by the authorities above cited. There being no evidence of ill will between the defendant and deceased prior to the morning that they had a fuss just prior to the killing, and no motive being shown as to why the defendant should desire to kill his own wife, and the errors heretofore discussed as revealed by the record in this case, we cannot but come to the conclusion that justice demands a modification of this judgment from that of death, to a term of life imprisonment at hard labor."

And in Hubka v. State, 40 Okla. Cr. 161, 267 P. 864, 867, we say:

"The duty imposed upon the court of protecting the taking of human life is a grave and solemn one; to take the life of a human being, even when taken by the law, is a trying and grievous task. Considering the whole testimony in this case, we feel constrained to say that we find few paliating circumstances in behalf of the defendant. * * *

"Taking all the facts into consideration and the enmity and feeling that seems to have existed between them, we are of the opinion that the punishment imposed is excessive, and that justice requires a modification of the judgment and sentence of death to that of imprisonment at hard labor in the State Penitentiary for life, and, as so modified, the judgment herein is affirmed."

See Bradley v. State, 31 Okla. Cr. 194, 237 P. 625; Young v. State, 19 Okla. Cr. 363, 200 P. 260; Walker v. State, 20 Okla. Cr. 319, 202 P. 799; Methvin v. State, 60 Okla. Cr. 1, 60 P. 2d 1062; Holford v. State, 57 Okla. Cr. 431, 48 P. 2d 1082; Goben v. State, 32 Okla. Cr. 237, 240 P. 1085.

In the recent case of Waters v. State, 87 Okla. Cr. 236, 197 P. 2d 299, 306, where the death sentence was imposed and modified to life imprisonment, we had occasion to refer to the case of Mannon v. State, 68 Okla. Cr. 267, 98 P. 2d 73, and cite all of the cases decided by this Court where the death penalty had been inflicted, and to recite all of the cases since that case was decided. It was there said:

"It will thus be noted that of the nineteen cases where the death penalty has been assessed since the Mannon case was decided, five have been modified, and fourteen affirmed."

Notwithstanding what has been said, this court has consistently held that a defendant has the right to enter a plea of guilty, and the right to waive, not only certain statutory rights, but also certain constitutional rights. Norman v. State, 81 Okla. Cr. 78, 160 P. 2d 739; Hughes v. State, 83 Okla. Cr. 16, 172 P. 2d 435; Fields v. State, 77 Okla. Cr. 1, 138 P. 2d 124; Ex parte Gault et al., 78 Okla. Cr. 172, 146 P. 2d 133; In re Carpenter, 80 Okla. Cr. 78, 157 P. 2d 231; In re Hazel, 80 Okla. Cr. 66, 157 P. 2d 225; Ex parte Cook, 87 Okla. Cr. 404, 183 P. 2d 595, and many cases cited in the above.

We also wish to call attention to a case recently decided by this court: Fry v. State, 78 Okla. Cr. 299, 147 P. 2d 803, 804. Many of the facts in that case are very similar to the facts in the instant case. We shall not repeat them as they may be read by those who desire. We held in that case that the confession of defendant was voluntarily made, and there the judgment and sentence was modified from a term of 25 years to 15 years in the penitentiary. The seventh and eighth paragraphs of the syllabus read:

"While the procedure in the federal courts is somewhat similar to that above outlined, federal courts, including the Supreme Court of the United States, are much more strict, where federal statutes are involved, than are the state courts, in determining whether a statement or confession is voluntary or involuntary, where made to federal officers before the party is taken before an examining magistrate.

"The Supreme Court of the United States, by its decisions, has limited its power to undo convictions in state courts to the enforcement of the fundamental principles of liberty and justice which are secured by the Fourteenth or other amendments to the Federal Constitution."

In the Fry case, we noted a distinction between the decisions of the federal courts and the state courts, and referred to the McNabb case, McNabb v. United States, 318 U. S. 332, 63 S. Ct. 608, 87 L. Ed. 819, a decision of the United States Supreme Court which has caused wide-spread discussion in the leading bar journals of this country, and also in Congress.

In the January, 1949 issue of the American Bar Journal, in a discussion of this case, it is said:

"The Confession Dilemma in the United States Supreme Court: In 1943, although no question of constitutional law was involved since the defendants had not been coerced, the Supreme Court set aside the convictions of certain self-confessed killers upon the ground that their confessions were obtained during a delay in arraignment and, therefore, should not have been admitted into evidence. McNabb v. United States, 318 U. S. 332 [63 S. Ct. 608, 87 L. Ed. 819]. An article by Fred E. Inbau, Professor of Law at Northwestern University and a former Director of the Chicago Police Scientific Crime Detection Laboratory, which appears in the September-October issue of the Illinois Law Review (Vol. 43-No. 4, pages 442-463) discusses the McNabb case and describes the confusion which had resulted from the attempted application of the rule of that case in subsequent cases. Professor Inbau argues that it is difficult to find support for the position taken by the Supreme Court in the legislative history of the federal arraignment statutes cited in the McNabb case, and that the Court's decision has deprived competent and well-meaning officers of the opportunity to interrogate criminal suspects where interrogation is an indispensable aspect of case investigation. He states that the opportunity is presented to the Court in Upshaw v. United States, [83 U. S. App. D. C. 207] 168 F. 2d 167, certiorari granted 1948, 334 U. S. 842 [68 S. Ct. 1505], either to overrule the McNabb case or to subject the rule to considerable modification. It may now be noted that on December 13, the Supreme

Court (four justices dissenting) reversed the Circuit Court of Appeals, [335 U. S. 410, 69 S. Ct. 170], thereby setting aside the conviction of the petitioner upon the ground that his confession was inadmissible."

See McNabb v. United States, supra; Anderson v. United States, 318 U.S. 350, 63 S. Ct. 599, 87 L. Ed. 829; Mitchell v. United States, 322 U.S. 65, 64 S. Ct. 896, 88 L. Ed. 1140; Bute v. Illinois. 333 U.S. 640, 68 S. Ct. 763, 92 L. Ed. 986; Upshaw v. United States, 83 U.S. App. D. C. 207, 168 F. 2d 167; Id., 335 U. S. 410, 69 S. Ct. 170, 93 L. Ed. —; Uveges v. Pennsylvania, 335 U. S. 437, 69 S. Ct. 184, 93 L. Ed. —.

Defendants have cited and quoted from the McNabb case, and also from the case of Lyons v. State, 77 Okla. Cr. 197, 138 P. 2d 142, 143, 140 P. 2d 248, which was appealed to the Supreme Court of the United States. 322 U. S. 586, 64 S. Ct. 1208, 88 L. Ed. 1481. In the Lyons case, and also in the case of Pressley v. State, 71 Okla. Cr. 436, 112 P. 2d 809, we fully discussed the question of voluntary and involuntary confessions.

The McNabb case was by a closely divided court, and was one involving federal law and procedure. The Mitchell case, supra, which was decided April 24, 1944, was one arising out of the violation of the laws of the District of Columbia and therefore cognizable under the federal law. In the McNabb case the confessions or statements of the defendants were held inadmissible. In the Mitchell case they were held admissible. After the decision in the Mitchell case many of the state courts refused to follow the principle announced in the McNabb case, as applicable to violations of the state laws, and the procedure followed by the state courts for a long period of time. This court followed the same rule in Fry v. State, supra. The Upshaw case, supra, which was decided on December 13,

1948, was also one based on a violation of the District of Columbia statute. It was a five to four decision. Mr. Justice Black wrote the majority opinion, and Justices Reed, Jackson, Burton and Chief Justice Vinson dissented, Justice Reed writing the dissenting opinion. In that case the court not only affirmed the McNabb case, but seems to have established the unusual rule that under federal practice and procedure every confession or statement obtained by police after unnecessary delay in arraignment for commitment and before magisterial commitment must be barred from the trial.

The dissenting opinion of Justice Reed in the Upshaw case is, in the opinion of the author of this opinion, clear and concise, especially as applied to state courts. It is there said [335 U. S. 410, 69 S. Ct. 173]:

"My objection to this Court's action of today in what seems to me an extension of the scope of nonadmissibility of confessions in the federal courts is not to its power so to act but to the advisability of such an additional step. Unless Congress or a majority of this Court modifies the McNabb rule, I feel bound to follow my understanding of its meaning in similar cases that may arise, but that duty does not impose upon me the obligation to accept this ruling as to Upshaw which seems to me to compound certain unfortunate results of the McNabb decision by extending it to circumstances beyond the scope of the McNabb ruling. This attitude leads me (I) to analyze the McNabb case and its offspring, (II) to point out why I think the present decision goes beyond the holding in McNabb and (III) to point out why McNabb should not be extended.

"The judicial approach to the problem, of course, must be in a spirit of cooperation with the police officials in the administration of justice. They are directly charged with the responsibility for the maintenance of law and order and are under the same obligation as the judicial

arm to discharge their duties in a manner consistent with the Constitution and statutes. The prevention and punishment of crime is a difficult and dangerous task, for the most part performed by security and prosecuting personnel in a spirit of public service to the community. Only by the maintenance of order may the rights of the criminal and the law abiding elements of the population be protected. As has been pointed out by this Court in the McNabb and Mitchell cases, United States v. Mitchell, 322 U. S. 65, 64 S. Ct. 896, 88 L. Ed. 1140, *there is no constitutional problem involved in deciding whether a voluntary confession given by a prisoner prior to commitment by a magistrate should be admitted in evidence.* [Emphasis supplied.] A prisoner's constitutional rights against self-incrimination or to due process are protected by the rule that no involuntary confession may be admitted. McNabb v. United States, supra, (318 U. S. pages 339, 340, 63 S. Ct. [608] 612, 87 L. Ed. 819 [823, 824]); and cases cited; Haley v. Ohio, 332 U. S. 596, 68 S. Ct. 302 [92 L. Ed. 224]; Malinski v. New York, 324 U. S. 401, 65 S. Ct. 781, 89 L. Ed. 1029; Ashcraft v. Tennessee, 322 U. S. 143, 64 S. Ct. 921, 88 L. Ed. 1192."

The dissenting opinion then gives the writer's view of the holding in the Upshaw case as follows:

"Proper protection of the ignorant is of course desirable, but the rule now announced forces exclusion of all confessions given during illegal restraint. It will shift the inquiry to the legality of the arrest and restraint, rather than to whether the confession was voluntary. Such exclusion becomes automatic on proof of detention in violation of the commitment statute, followed by a confession to police officials before commitment. It is now made analogous to the exclusion of evidence obtained in violation of the Bill of Rights through unreasonable search and seizure or through compulsion or by denial of due process. I do not think this is the doctrine of the McNabb case or that it should now be made an explicit rule of federal law. * * *

"A court never knows whether a confession is or is not voluntary. It bars confessions on uncontroverted proof of facts which as a matter of law are deemed so coercive as to be likely to produce an involuntary confession. Chambers v. Florida, 309 U. S. 227, 238, 239, 60 S. Ct. 472, 478, 84 L. Ed. 716 [722, 723]; Malinski v. New York, 324 U. S. 401, 404, 65 S. Ct. 781, 783, 89 L. Ed. 1029 [1032]. If illegal detention alone were deemed that coercive, the confessions would be barred as a matter of due process in both state and federal courts. [Haley v. Ohio, 332 U. S. 596, 68 S. Ct. 302, 92 L. Ed. 224]. So here if illegal detention alone is the decisive factor, the rule of exclusion surely will apply to both the state and federal trials as violative of the Due Process Clause. *But the McNabb rule does not apply to trials in state courts.* [Emphasis supplied.] It is because illegal detention was not thought to be per se coercive that it was necessary to create the McNabb rule of exclusion.

"For the foregoing reasons, I conclude that detention alone, even for the purpose of obtaining information, should not be sufficient to justify the exclusion of a confession to police officers obtained after unnecessary delay and before commitment."

Under section 3, note 29, the court cites the following cases from state courts which have refused to follow the rule announced in the McNabb case: Fry v. State, 78 Okla. Cr. 299, 147 P. 2d 803, 810, 811; State v. Folkes, 174 Or. 568, 150 P. 2d 17, 25; State v. Smith, 158 Kan. 645, 149 P. 2d 600, 604; People v. Malinski, 292 N. Y. 360, 55 N. E. 2d 353, 357, 365; State v. Collett, Ohio App., 58 N. E. 2d 417, 426, 427; State v. Nagel, N. D., 28 N. W. 2d 665, 679; State v. Ellis, 354 Mo. 998, 193 S. W. 2d 31, 34, 37; Finley v. State, 153 Fla. 394, 14 So. 2d 844; State v. Browning, 206 Ark. 791, 178 S. W. 2d 77, 78-80; Russell v. State, 196 Ga. 275, 26 S. E. 2d 528, 534.

Justice Reed then gives his reason for not agreeing with the doctrine announced in the Upshaw case as follows:

"I do not agree that we should now extend the McNabb rule by saying that every confession obtained by police after unnecessary delay in arraignment for commitment and before magisterial commitment must be barred from the trial. Those most concerned with a proper administration of the criminal law are against any extension.

"(1) The departure of the McNabb and Anderson cases from well-established methods for protection against coercion has been condemned by the House of Representatives and not acted upon by the Senate.

"(2) Officers charged with enforcement of the criminal law have objected for the reason that fear of the application of its drastic penalties deterred officers from questioning during reasonable delays in commitment.

"(3) State courts under similar laws and conditions have refused to follow the McNabb example.

"(4) Law Review comment generally condemns the rule."

The dissenting opinion then concludes:

"Such condemnation of even the restricted McNabb rule by those immediately responsible for the enactment and administration of our criminal laws should make this Court, so far removed from the actualities of crime prevention, hesitate long before pushing farther by judicial legislation its conception of the proprieties in criminal investigation. It takes this step in the belief that thereby it strengthens criminal administration by protecting a prisoner. A prisoner should have protection but it is well to remember that *law and order is an essential prerequisite to the protection of the security of all.* Today's decision puts another weapon in the hand of the criminal world. Apparently the Court intends to make the

rule of commitment 'without unnecessary delay' an iron rule without flexibility to meet the emergencies of conspiracies, search for confederates, or examining into the ramifications of criminality. The Court does this by failing to distinguish between necessary and unnecessary delay in commitment. It uses words like 'forthwith' and 'promptly' and thus destroys the leeway given by the Rule to police investigations. All, I think, without any need for such action since every coerced confession has been inadmissible for generations. The position stated in this dissent does not envisage a surrender to evils in the handling of criminals. *If there is a prevalent abuse of the right to question prisoners, the sounder remedy lies in police discipline, in statutory punishment of offending officials, in vigorous judicial protection against unconstitutional pressures for confessions, and in legislative enactments for inquiries into circumstances surrounding crimes by methods that protect both the public and suspects*—for example, an inquiry before a magistrate with sealed evidence. [Emphasis supplied.]

"I would affirm this conviction in reliance upon the verdict of the properly instructed jury that this was a voluntary confession."

We have referred to the above decisions of the United States Supreme Court because of the importance of the question of confessions and statements taken by officers prior to taking a defendant before the committing magistrate after his arrest. This court and all of the courts of this state have been and are now very much interested in this question, and more especially since the decision in the McNabb and Upshaw cases. As to those cases, we are construing them as applicable to federal law and federal procedure, and we are justified in so doing by statements made therein. However, we recognize the fact that an appeal lies from this court to the Supreme Court of the United States when the Constitution of the United States and the due process and

equal protection clauses of the Constitution are involved. We have always followed the decisions of that high court where these questions were involved. Greiner v. City of Yale, 77 Okla. Cr. 135, 139 P. 2d 606; Wood v. State, 77 Okla. Cr. 305, 141 P. 2d 309; Pendley v. State, 77 Okla. Cr. 259, 141 P. 2d 118; Lyons v. State, supra.

But where the construction of purely state statutes, such as admitting or not admitting voluntary and involuntary statements is concerned, we consider that we should follow the dictates of our own conscience and reasoning. This is especially true where it is backed up by long and continuous decisions of this court, and the Supreme Courts of many other states. This court has repeatedly held that before permitting a jury to hear a confession or statement made by a defendant to an officer, the court should excuse the jury and hear all the facts and circumstances under which the statement or confession was made, and determining as a matter of law whether the same was voluntary or unvoluntary. We have held that after this decision is made by the court, he may then in his discretion submit this issue to the jury as a question of fact for their consideration; but as above stated, the question should first be decided by the court as a question of law, and no responsibility should be shifted to the jury to decide this fact where the court is of the opinion under the law and the facts that the statement or confession is involuntary and inadmissible for that reason. This rule, in our judgment, protects not only the defendant but also the state. As stated in the dissenting opinion in the Upshaw case, "law and order is an essential prerequisite to the protection of the security of all." It gives the peace officer an opportunity to enforce the law. We reiterate that this right should not be abused by cruel or unusual treat-

ment being inflicted upon one who has been placed in confinement, nor should there be made a promise of reward in order to secure from him a statement or confession. He should be taken before a magistrate within a reasonable time and advised of his rights under the law, and as provided by the statute, he should, if he desires, have counsel appointed to advise and defend him when arraigned.

The action in this case having been upon a plea of guilty, the presumption is that the court who sentenced the defendants took into consideration a proper interpretation of the law, and therefore had the right to accept the pleas of guilty of these defendants. It is only for the reasons above stated that the judgment and sentence is modified from death to life imprisonment.

As to the contention that counsel who was appointed for the defendants did not have time to investigate the facts, and was not aware of the facts existing prior to the time the pleas of guilty were entered by the defendants, we will state that while the record reveals the appointment of Mr. Gilbert W. Daney was made on May 2, 1947, the date defendants were arraigned and entered their pleas of guilty, Mr. Daney, at the hearing on the motion to withdraw pleas of guilty, etc., testified, as did Judge Sullivan, that he had been called by the court on Thursday, May 1, and notified he would be appointed to defend. That he visited the jail and talked to the defendants on that date, and he thought at one other time prior to their pleas of guilty, and that he had been informed of the acts of the sheriff prior to the entering of the pleas of guilty by defendants. His testimony was:

"Q. How many times did you discuss the matter with them before they were arraigned in district court? A. Four times. Three times in jail, and once here."

He testified that one of the times he talked with them in jail was prior to the arraignment on May 2, 1947, and the other times were prior to the sentencing on May 5, 1947.

With reference to his knowledge of the acts of the sheriff prior to taking the statements from the defendants, he testified: (By Mr. Paul)

"Q. Did you have any knowledge of the facts I have related to you? A. I did. Q. Who did you get it from? A. I got it from somewhere. Q. I mean before Isom Williams or Edward Lewis plead guilty? A. You see, Judge, if I remember right, up here they both tried to plead guilty. In other words, they said they were guilty, and I think on one occasion that the Court advised them he would not accept that plea of guilty. And in that discussion, of course, this matter came out. Q. What we want to know, Mr. Daney, is whether you had the information at the time you were present in court here on May 2nd, the time they plead guilty? A. I had the information. I went out there myself. Q. Did you go out there before May 2nd? A. I couldn't say whether it was before May 2nd, but it was between the time I was appointed and when they were sentenced. Q. You were appointed, you say, on the afternoon of May 1st, you only had that night and until the next morning until ten? The Court. He said he went out there before the day of arraignment. Mr. Paul: Q. I mean the day before the arraignment, or the day after the arraignment. A. I couldn't say. Q. I will ask you if it is not a fact that the statement made by Isom Williams, in this record on page 15, was not the first information you had in regard to him being taken to the house and handcuffed to the bed? Was that the first information you had as to that fact? A. No. I had that information before they were arraigned, before they were sentenced. Q. That is, when they were being arraigned? A. Oh, yes, I had the information before this. Q. Where did you get it? A. Well, I must have gotten it from him, himself. Q. Do you mean to tell this Court you had that

information and you sat here in open court and let them plead guilty? Mr. Parker: We object to that, as argumentative, and attempting to impeach his own witness. The Court: I will sustain that objection. Mr. Paul: Defendant excepts. Q. Did you have any information that the defendants, Isom Williams and Edward Lewis, were taken before the arraignment, did you get this information before they were arraigned and plead guilty, to the funeral home in Atoka and there to view the corpse of Mr. Wallace, deceased? The Court: That is not in the record. Mr. Paul: It is not in the record, but we expect to prove it, that he had information prior to the time. The Court: All right. If you don't prove it— Mr. Paul: If we don't prove it, all right. Q. Did you have such information? A. I believe I did. Q. Before the arraignment? A. Yes, sir. Q. Where did you get that information? A. Well, I got it about like I got the other information. Q. Was Bob Wheeler present when you got that information? A. I am not sure. Bob Wheeler was present on the two occasions, if I remember right. Q. You testified you only talked to him one time before arraignment when he was present? A. It could have been one of those times when Bob was with them. Q. You had this information before they plead guilty May 2nd about them going down and taking this defendant, Isom Williams, down to the house where Mr. Wallace died and their chaining him to the bed? A. I had the information. I didn't have the information in detail. Q. You also had the information before you plead them guilty in District court? ? A. I didn't plead them guilty."

From this statement, we are of the opinion that the record justified the conclusion that it was the voluntary desire of the defendants to enter pleas of guilty, and that under all the circumstances they did so after being informed of all their rights by the court and by counsel who represented them; and that counsel had knowledge of the facts before they were sentenced by the court.

The evidence in this case reveals that the defendants were full-blood Indians. Their education is very

limited. One of them had never attended school, and the other had gone only to the fourth grade. They spoke broken English, and were not familiar with criminal procedure in the court room. Neither of them had ever been charged with a crime before this. The deceased was 86 years of age and very feeble. The infliction of very little punishment would undoubtedly have caused his death. There is no affirmative proof that any deadly weapon was used by the defendants. They used only their fists and hands. The amount of money secured was very small. The defendants were intoxicated at the time of the commission of the crime. While the crime committed cannot be condoned, yet the above facts may be taken into consideration in determining whether defendants intended to take a human life and in arriving at the punishment to be inflicted, and as to whether the judgments and sentences should be modified.

After a review of all the record in this case, one can but come to the conclusion that justice has been done by a modification of these sentences, as above stated. While there are single acts which can not be approved by the court, and under other conditions might justify a reversal of this case, yet when considered as a whole, and in view of the former decisions of this court, we are justified in holding that the pleas of guilty by the defendants were voluntarily made and that under all the circumstances the court was justified in accepting those pleas. and sentencing the defendants. We do not believe that the extreme penalty should be inflicted in this case.

For the reasons above stated, the judgment and sentence of the district court of Atoka county should be modified from death by electrocution to imprisonment in the

State Penitentiary for life for each of said defendants, Isom Williams and Edward Lewis.

It is so ordered.

JONES, P. J., and BRETT, J., concur.